HOFFMAN MINING COMPANY, INC., Appellant

v.

ZONING HEARING BOARD OF ADAMS TOWNSHIP, Cambria County and Township of Adams.

Commonwealth Court of Pennsylvania.

Argued Sept. 10, 2008.

Decided Oct. 15, 2008.

Michael W. Sahlaney, Johnstown, for appellant.

Gary L. Costlow, Johnstown, for appellee.

Kevin J. Garber, Pittsburgh, for amicus curiae, The Pennsylvania Coal Association.

Blake C. Marles, Lehigh Valley, for amicus curiae, Pennsylvania Aggregates and Concrete Association.

BEFORE: SMITH–RIBNER, Judge, and PELLEGRINI, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Hoffman Mining Company, Inc. (Hoffman)[1] appeals from the order of the Court of Common Pleas of Cambria County (trial court) affirming the decision of the Zoning Hearing Board of Adams Township (Board) to deny Hoffman's application for a variance to conduct surface coal mining within 300 feet of residences because a local ordinance requires a 1,000 foot setback for all mining activities and is not preempted by the Surface Mining Conservation and Reclamation Act (SMCRA).[2]

Hoffman leases a 182.1 acre tract of land (Property) in Adams Township, Pennsylvania, from Berwind Corporation (Berwind). On or about November 20, 2006, Hoffman submitted an application to the Board for a variance from Section 1413, Paragraph 5a of the Adams Township Zoning Ordinance (Zoning Ordinance) to allow surface coal mining within 300 feet of residences.[3] To conduct surface coal mining, the Zoning Ordinance required a 1,000 foot setback from residential structures.[4] However,

---

1. Both the Pennsylvania Coal Association and the Pennsylvania Aggregates and Concrete Association filed amici curiae briefs on behalf of Hoffman.

2. Act of November 30, 1971, P.L. 554, *as amended*, 52 P.S. §§ 1396.1–1396.31.

3. Hoffman also submitted an application for a special exception for surface mining operations on the Property and a request for a variance from Section 1413, Paragraph 2 of the Zoning Ordinance to permit the operation of surface mining activities after dark within 1,500 feet of residential areas. Hoffman's request for the variance to conduct mining activities at night was granted by the Board "insofar as it purports to regulate hours of operation[.]" (Board's February 1, 2007 Decision at 3.) Hoffman's application for a spe-

cial exception was also granted by the Board on the condition that "any ponds erected must be surrounded by a five (5) foot fence." *Id.*

4. Section 1413, Paragraph 5(a) of the Zoning Ordinance is titled "Strip Mining and Deep Mining Operations" and states the following:
 Mining activities are permitted only by special exception in the Conservancy (S) District and subject to the following regulations:
 * * *
 5. Setback Requirements—All mining, excavating, and blasting activities shall maintain, at a minimum:
 a. A 1,000 foot horizontal distance from all residential structures;
 b. A 1,000 foot horizontal distance from all municipal watershed areas;

under Section 4.5 of the SMCRA, 52 P.S. § 1396.4e(h)(5),[5] and Section 4.2 of the SMCRA, 52 P.S. § 1396.4b(c),[6] only a 300 foot setback from an occupied dwelling is required for surface mining operations. Three separate hearings were held before the Board on the following dates: December 15, 2006, January 11, 2007, and February 1, 2007. Hoffman presented the testimony of several witnesses in support of its argument before the Board that Section 17.1 of the SMCRA, 52 P.S. § 1396.17(a),[7] required the Zoning Ordinance's setback of 1,000 feet to be preempted.

Randy Musser (Musser), the registered professional engineer that prepared Hoffman's surface mining permit to the Department of Environmental Protection (Department), testified before the Board about the physical layout of the surface mining site, its safety features, and the mitigation and reclamation steps that would be taken by Hoffman.

Regarding erosion control and storm water management of the Property, Musser testified that there were several ponds on the site to collect runoff from any of the areas disturbed by the mining activities. Besides the ponds, Musser testified that diversion ditches would collect all of the water that would be created by the mine site. Musser also testified that from the 300 foot barrier line on the permit application, a spoil pile was proposed that would serve as a buffer from the coal removal activity. In response to a question con-

 c. A 300 foot horizontal distance from all perennial steams and wetlands; and
 d. A 100 foot horizontal distance from all adjoining property lines and public roads.
(Adams Township Zoning Ordinance, Appellant's Exhibit A–5, Original Record at 71.)

5. Section 4.5 of the SMCRA, 52 P.S. § 1396.4e, provides, in relevant part:
 (h) Subject to valid existing rights as they are defined under § 522 of the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 et seq., no surface mining operations except those which existed on August 3, 1977 shall be permitted:
 ❖ ❖ ❖
 5) *within three hundred feet from any occupied dwelling,* unless waived by the owner thereof, nor within three hundred feet of any public building, school, church, community, nor institutional building, public park or within one hundred feet of a cemetery.
(Emphasis added.)

6. Section 4.2 of the SMCRA, 52 P.S. § 1396.4b(c), provides, in relevant part:
 (c) From the effective date of this act, as amended hereby, no operator shall conduct surface mining operations (other than borrow pits for highway construction purposes) within one hundred feet of the outside line of the right-of-way of any public highway or *within three hundred feet of any occupied dwelling,* unless released by the owner thereof, nor within three hundred feet of any public building, public park, school, church, community or institutional building or within one hundred feet of any cemetery. The secretary may grant operators variances to the distance requirements herein established where he is satisfied that special circumstances warrant such exceptions and that the interest of the public and landowners affected thereby will be adequately protected. Prior to granting any such variances, the operator shall be required to give public notice of his application therefor in two newspapers of general circulation in the area once a week for two successive weeks. Should any person file an exception to the proposed variance within twenty days of the last publication thereof, the department shall conduct a public hearing with respect thereto.
(Emphasis added.)

7. Section 17.1 of the SMCRA, 52 P.S. § 1396.17a, provides:
 Except with respect to ordinances adopted pursuant to the act of July 31, 1968 (P.L. 805, No. 247), known as the Pennsylvania Municipalities Planning Code, all local ordinances and enactments purporting to regulate surface mining are hereby superseded. The Commonwealth by this enactment hereby preempts the regulation of surface mining as herein defined.

cerning rocks escaping from the mining area and coming into the town, Musser testified that a rock could escape and go into the town below, but also stated that the proposed spoil pile barrier would essentially serve as a protective wall of dirt.

Several residents expressed concern over the safety of the children entering the site, to which Musser responded that the only thing proposed to prevent children from going onto the hill was the spoil wall and the 300 foot barrier. In response to a question about what would happen to the foundations of homes in the town when the spoil wall started to crumble, Musser testified that the blasting was regulated by the Department, and everyone who lived within one-half mile from the mine site would be notified in advance before blasting began. Musser explained that a team typically came into the homes before the blast to do a pre-blast survey to document conditions, so that if there were blasting-related damages, claims could be made through the Department to have them repaired. One resident questioned Musser concerning the dirt on the hill coming down where kids play in backyards and whether the dirt pile was covered during blasting. Another resident expressed concern over Hoffman's use of the road for hauling coal and whether the ponds could hold enough of the water run-off during major storms. Musser responded by testifying that the ponds would have dewatering devices, and that if there was a large storm, the ponds would contain pipes to drain the water.

Musser further testified that Hoffman did not propose any crushing, screening or processing of coal in the permit area as mitigation steps in the permit application, and that all coal would be removed and hauled off site. Musser added that Hoffman would use the normal dust control procedures, including watering the travel and haul roads, limiting the blasting if necessary, tarping trucks and limiting the speed of the trucks on the roads.

On the topic of the Property's physical mining constraints, Musser testified that a transmission gas line limited mining operations on the north side of the Property because blasting was not allowed within 200 feet of that line. In response to a question as to the extent that prior mining activities limited what could be done on the Property, Musser testified that the deep mines on the Property extracted a large portion of coal, and that the property had been previously stripmined, so that there was a limitation as to what could be recovered. He added that if there had not been the deep mining, mining operations could have moved further back along the Property.

Regarding reclamation after mining was complete, Musser stated that after all of the coal was removed, the pits would be closed and then the area would be regraded with topsoil or another adequate material for re-vegetating. Musser further testified that the restoration with scarification of the land would have similar runoff characteristics to the woodlands that previously existed. Musser added that the post-mining use of the land would be the same after the coal was removed as it was prior to the mining. He explained that the mining and reclamation would most likely take, from beginning to end, a maximum of four years to have the area reclaimed and growing.

Next, Randall L. Urban (Urban), the business manager and chief financial officer for Hoffman, testified before the Board that the Property's probable reserves of recoverable coal were approximately 250,-000 tons. Urban further testified that at $35 per ton, this amounted to approximately $9,000,000 worth of coal, and that if the Township's setback of 300 feet was imposed, Hoffman would be left with only

33,000 tons of coal to extract or approximately $900,000. Urban explained that Hoffman's typical hours of operation would be from 6:00 a.m. until 2:00 or 3:00 a.m. He also testified that the bulldozers would work at night to remove overburden, and that the drilling or blasting would not happen in the evening, but only during the daylight hours. In terms of loading and removing coal from the site, Urban testified that this would take place during the daylight hours from 6:00 a.m. until late in the afternoon. Urban also testified that the noise from the facility would be reduced because instead of using backup alarms, Hoffman would use blinking lights as a warning for trucks backing up. Urban also testified that there would not be any floodlights at the facility. With respect to the roads, Urban testified that Hoffman maintained bonds for the township roads and had actually improved some of the roads. Urban also testified as to the security measures at the site and indicated that the area of the mine site was clearly delineated and signs were posted at the site entrances stating that guests should not be on the mine site. In addition, Urban testified that the noise from the facility would be reduced because of the presence of the spoil piles and trees between it and the residences. In terms of the safety of the spoil pile, Urban testified that they used a machine to pack the pile and then Hoffman was required to build safety bunkers. Urban also added that it was very unlikely that materials would run off the safety bunkers.

Daniel Roman (Roman), the engineering manager and property manager from Berwind, testified as to the mining potential and physical characteristics of the Property. Roman testified that Berwind granted the easement for the gas transmission line running across the Property. Roman further testified that if the gas line was not on the Property, coal could be recovered further back from the residences, and that if the mine on the Property had not been surface-mined periodically or deep-mined, more coal could have been recovered further back from the residences.

During the public comment phase of the hearings before the Board, several residents testified that they were very concerned about the surface mine's effect on the health of their children, specifically with regard to respiratory problems such as asthma. They also testified before the Board that they opposed the Board granting a variance or special exception to Hoffman because of the potential noise, future storm water problems, and the structural safety of their homes.

 In its findings of fact, the Board found credible the testimony of homeowners concerning the hazards related to the potential mining which included the following: debris and dust descending into the village due to the proposed site's location on a steep incline above the residences; the proposed site's open holding ponds 12–14 feet deep adjacent to areas where children played; and the significant health problems, including asthma and other breathing problems from which many of the residents in the affected area already suffered. The Board framed the threshold issue as whether the Zoning Ordinance was preempted by the SMCRA. Highlighting the distinction between regulations and zoning setbacks, the Board found that the setback provision in Section 1413, Paragraph 5(a) of the Zoning Ordinance was not preempted. The Board also found that as a matter of law, there were "substantial health, safety and welfare issues which would weigh against the reduction of the 1,000 foot setback," and denied the request for a variance from Section 1413, Paragraph 5(a)'s 1,000 foot setback. (Board's February 19, 2007 Opinion and

Order at 3.) Hoffman appealed the decision to the trial court, which dismissed the appeal and affirmed the Board. This appeal followed.[8]

## I.

Hoffman contends that the Board committed an error of law by finding that the SMCRA does not preempt the Zoning Ordinance's setback requirement of 1,000 feet because the setback is preempted by Section 17.1 of the SMCRA, 52 P.S. § 1396.17a, which states: [t]he Commonwealth by this enactment hereby preempts the regulation of surface mining as herein.

▮ Hoffman contends that Section 17.1 of the SMCRA specifically preempts Section 1413, Paragraph 5(a) of the Zoning Ordinance which provides that mining activities are permitted only by special exception in the Conservancy (S) District and are subject to the requirement that all mining, excavating and blasting activities shall maintain, at a minimum, a 1,000 foot horizontal distance from all residential structures. (Adams Township Zoning Ordinance, Appellant's Exhibit A–5, Original Record at 71.) It also argues that the Zoning Ordinance is implicitly preempted under the five-part test developed in *Duff v. Township of Northampton*, 532 A.2d 500 (Pa.Cmwlth.1987).[9]

▮ Whether a state statute preempts local regulation is determined by the intent of the General Assembly. The General Assembly can specifically express its intent by either providing that municipalities may enact ordinances not inconsistent with state law, limiting what subjects of regulation that may be enacted, or by expressly forbidding municipal regulation altogether. However, the General Assembly is often silent and is not presumed to have preempted the field by legislating in it; therefore, it must clearly be shown that it was the General Assembly's intent to preempt the field by legislation. *Retail Master Bakers Association v. Allegheny County*, 400 Pa. 1, 161 A.2d 36 (1960); *Baird v. Township of New Britain*, 159 Pa.Cmwlth. 333, 633 A.2d 225 (1993). The presumption against preemption is based on the understanding that what is being preempted is the ability of the municipality, through its elected local officials, to address the needs of its citizens.

In this case, because the General Assembly has spoken as to the extent that it wants the SMCRA to preempt local zoning, an examination of whether the General Assembly implicitly intended to preempt the area, as Hoffman suggests, is inappropriate. All that is at issue here is whether Section 17.1 of the SMCRA expressly

---

8. Where the trial court did not take any additional evidence, this Court's scope of review is limited to determining whether the Board committed an error of law or an abuse of discretion. *Stoltzfus v. Zoning Hearing Board of Eden Tp., Lancaster County*, 937 A.2d 548 (Pa.Cmwlth.2007). This Court's scope of review is plenary as to questions of law. *In re Realen Valley Forge Greenes Associates*, 576 Pa. 115, 838 A.2d 718 (2003).

9. Under the *"Duff test,"* the following five questions are pertinent in determining the preemption issues:
 (1) Does the ordinance conflict with the state law, either because of conflicting poli-

cies or operational effect, that is, does the ordinance forbid what the legislature has permitted?
(2) Was the state law intended expressly or impliedly to be exclusive in the field?
(3) Does the subject matter reflect a need for uniformity?
(4) Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation?
(5) Does the ordinance stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the legislature?
*Id.*, 532 A.2d at 505.

preempts all zoning regulations enacted after the adoption of SMCRA. To reiterate, all that Section 17.1 of the SMCRA states is the following:

> Except with respect to ordinances adopted pursuant to the act of July 31, 1968 (P.L. 805, No. 247), known as the Pennsylvania Municipalities Planning Code, all local ordinances and enactments purporting to regulate surface mining are hereby superseded. The Commonwealth by this enactment hereby preempts the regulation of surface mining as herein.

From this section, it is evident that nothing in its language mentions that excluded from the express preemption of the regulation of surface mining were only zoning ordinances enacted before the effective date of the SMCRA. Nonetheless, relying on *Miller & Son Paving, Inc. v. Wrightstown Township*, 499 Pa. 80, 451 A.2d 1002 (1982), Hoffman contends that our Supreme Court interpreted the statute to only apply to ordinances enacted before the passage of the SMCRA.

In that case, our Supreme Court was initially asked to address whether setback requirements established by the SMCRA implicitly preempted the setback requirement of a township zoning ordinance because when the case was argued, Section 17 of SMCRA[10] had not yet been enacted. The Township in *Miller* adopted a new zoning ordinance in 1971 pursuant to the Municipalities Planning Code (MPC),[11] extending a quarry's setback from 100 feet of all boundaries to 200 feet from the boundary of any district where extraction was permitted, 300 feet from the center line of

any street, and 400 feet to the point of intersection of center lines of two streets. The SMCRA, newly enacted on January 1, 1972, established quarrying setbacks of 100 feet from the ultimate right-of-way or any highway and 300 feet from any occupied dwelling house, while its regulations required a 25 foot setback from any property line. Section 4.2 of the SMCRA, 52 P.S. § 1396.4b, 25 Pa.Code § 77.92. In construing Section 17 of the SMCRA, 52 P.S. § 1396.17, the Court first determined that the term "superseded" contained in the first sentence of Section 17 "ordinarily refers to the displacement of something that already exists, not something that may come into existence." *Id.* at 86, 451 A.2d at 1005. Our Supreme Court went on to hold that the first sentence of Section 17 served to displace all local regulations relating to surface mining, which were in existence as of the effective date of the SMCRA (January 1, 1972), except for zoning ordinances, and, as a result, the challenged ordinance was preserved from supersession because it was effective as of December 18, 1971. In so holding, it acknowledged that the General Assembly recognized that how surface mines were designed and operated needed to be uniform across the Commonwealth.

However, our Supreme Court in *Miller* went on to hold that by including the reservation language, it was clear that the Legislature did not intend "to displace all existing and future local regulation of surface mining." *Id.* at 86, 451 A.2d at 1004. The Court rejected the challenge to the township's imposition of setback requirements and held:

---

**10.** Section 17 of the SMCRA, 52 P.S. § 1396 (repealed), provided:

Except with respect to Zoning Ordinances, all local ordinances and enactments purporting to regulate surface mining are hereby superseded. The Commonwealth by this

enactment hereby preempts the regulation of surface mining operations as herein defined.

**11.** Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101–11202.

If a municipality can create a use zone excluding surface mining altogether, then it must surely be able to impose the lesser burden of requiring setbacks for such use in zones in which it is permitted.

*Id.* at 88, 451 A.2d at 1006.

By not preempting local zoning, the Supreme Court found that the General Assembly left to the local governments the right to determine what land uses were permitted in certain zones, where they were to be located on the property, and how approval was to be granted. If we were to hold otherwise, surface mines would be permissible in centers of cities, in residentially-zoned districts, etc.—in other words, everywhere and anywhere.

As to whether only zoning ordinances adopted prior to the Act were not preempted, Hoffman points to the language in which our Supreme Court in its concluding sentence stated that the ordinance was valid "it was adopted pursuant to the Municipalities Planning Code and before the effective date of the Surface Mining Act of 1971, it is neither superseded nor preempted by ... section 17.1." Hoffman argues that because our Supreme Court gave as one of the reasons for the zoning ordinance validity that it was passed before the SMCRA was enacted, that necessarily means that a zoning ordinance enacted before that date is preempted. In making that comment, all that the Supreme Court meant to say, though not artfully, is even if the ordinance regulated operational matters, those regulations were not preempted because they were adopted prior to the enactment of the SMCRA.

We maintained the distinction made in *Miller* and addressed what was permissible in a zoning ordinance governing where a mine could be located and what was preempted because it regulated how it could be technically designed and operated in *Warner Co. v. Zoning Township Hearing Board of Tredyffrin Township*, 148 Pa.Cmwlth. 609, 612 A.2d 578 (1992). In that case, a quarry operator challenged amendments to a zoning ordinance on the grounds that they regulated surface mining operations and were preempted by an almost identical provision to Section 17.1 of the SMCRA under the Noncoal Surface Mining Conservation and Reclamation Act (Noncoal Act).[12] After reviewing the pertinent holding of *Miller*, this Court reviewed the challenged ordinance and its amendments to determine whether they regulated surface mining operations as defined in the Noncoal Act and, therefore, preempted, or whether they regulated land use, which was a legitimate exercise of the township's powers under the MPC.[13] The challenged provisions of the amendments in *Warner* included the following: specific buffer and berm requirements; regulation of storage and reclamation of overburden; requirements for reclamation upon cessation of quarrying operations; requirements of dikes, barriers or structures to control drainage; and the submission of detailed plan of reclamation of land.

In light of the definition of surface mining in Section 3 of the Noncoal Act, 52 P.S. § 3303, we found that the Noncoal Act preempted those provisions dealing with buffers and berms, overburden storage,

---

**12.** Act of December 19, 1984, P.L. 1093, *as amended*, 52 P.S. §§ 3301–3326.

**13.** Because the zoning ordinance at issue in *Warner* was enacted pursuant to the MPC and before the effective date of the Noncoal Act, we found that the Noncoal Act did not supersede the ordinance. Therefore, we went on to conduct an analysis of the amendments adopted after the Noncoal Act was enacted to determine whether it was preempted.

reclamation and drainage structures because these sections regulated activities that were integral to surface mining. However, other provisions that included setback requirements prohibiting quarrying uses and permitted quarrying only by special exception were held by this Court to be "traditional land use regulations" not preempted by the Noncoal Act. *Id.* at 582. Therefore, in *Warner,* this Court examined the provisions of a challenged ordinance and divided them into two groups: those that specifically regulated the activity as defined in the respective legislation and those that were traditional land use regulations.

In subsequent cases analyzing similar statutes involving state preemption "except for zoning," we have held that zoning ordinances that regulate traditional zoning subjects, including, for example, which zone the regulated use is permitted or the manner in which approval needs to be sought, are not preempted. *See Southeastern Chester County Refuse Authority v. Zoning Hearing Bd. of London Grove Twp.,* 898 A.2d 680 (Pa.Cmwlth.2006), *petition for allowance of appeal denied,* 591 Pa. 740, 921 A.2d 499 (2007) (holding that setback and height requirements in zoning ordinance were not preempted by the Solid

Waste Act because they related to land use and not operation of a landfill); *Pennsylvania Coal Company, Inc. v. Twp. of Conemaugh,* 149 Pa.Cmwlth. 22, 612 A.2d 1090 (1992) (SMCRA and Noncoal Act preempted provisions of zoning ordinance that clearly regulated surface coal mining operations, but did not invalidate designation of appropriate zoning districts for the use).[14]

■ Because the definition of "surface mining activities"[15] concerns the methods by which the mineral (coal) is derived from the surface of the ground at all stages of the process, Section 1413, Paragraph 5(a) of the Zoning Ordinance is not preempted as it merely contains a required minimum numerical distance from which surface mining may be conducted next to a residential structure and how that permitted use is approved. The challenged provision of the Zoning Ordinance is a quintessential land use control logically connected to land use planning and is, therefore, not preempted by Section 17.1 of SMCRA.

## II.

### A.

■ In the alternative, Hoffman contends that the Board erred in denying its

14. For regulations held not to be land use regulations in the SMCRA and statutes containing similar preemptions language *see, e.g. Tinicum Twp. v. Delaware Valley Concrete, Inc.,* 812 A.2d 758, 764 (Pa.Cmwlth.2002) (ordinance regulating blasting preempted because it regulated surface mining operations rather than the traditional land use and all of its provisions went to when, where and how blasting could occur rather than what, where and how a particular land use would be permitted); *Plymouth Twp. v. Montgomery County,* 109 Pa.Cmwlth. 200, 531 A.2d 49, 50 (1985) (ordinance provisions regulating capacity, design and size of landfill were preempted).

15. "Surface mining activities" are defined in the SMCRA as follows:

[T]he extraction of coal from the earth or from waste or stock piles or from pits or banks by removing the strata or material which overlies or is above or between them or otherwise exposing and retrieving them from the surface, including, but not limited to, strip, auger mining, dredging, quarrying and leaching, and all surface activity connected with surface or underground mining, including, but not limited to, exploration, site preparation, entry, tunnel, drift, slope, shaft and borehole drilling and construction and activities related thereto, but not including those portions of mining operations carried out beneath the surface by means of shafts, tunnels or other underground mine openings.
(Section 3 of the SMCRA, 52 P.S. 1396.3.)

validity variance request because of the impact that it would have on its ability to mine its coal. A validity variance is granted when a zoning regulation is restrictive to the point of confiscation and the variance is necessary to permit a reasonable use of the land. *East Torresdale Civic Association v. Zoning Board of Adjustment*, 85 Pa.Cmwlth. 12, 481 A.2d 976 (1984). The applicant can establish the confiscatory nature of the zoning regulation by proving that the land has no value or only distressed value because of the regulation. *Hersh v. Zoning Hearing Board of Marlborough Township*, 90 Pa. Cmwlth. 15, 493 A.2d 807 (1985). Hoffman asserts that because of the unique physical circumstances and conditions of the Property, the 1,000 foot setback would deprive it of its ability to mine 220,000 tons of mineable coal or 88% of the reserves on the Property. Because the setback would have that effect, Hoffman argues that it has shown that the Zoning Ordinance has denied it of the use of its property entitling it to a variance.

■ To make out a case for a validity variance, a property owner must show that "(1) the effect of the regulations complained of is unique to the applicant's property and not merely a difficulty common to other lands in the neighborhood; and (2) the regulation is confiscatory in that it deprives the owner of the use of the property." *Shohola Falls Trails End Property Owners Association, Inc. v. Zoning Hearing Board of Shohola Twp., Pike County, Pa.*, 679 A.2d 1335, 1341–42 (Pa.Cmwlth. 1996). In that case, an owner who was claiming that the zoning deprived him of the use of the property had to show not only that the coal could not be mined, but that the property could not be reasonably used for any other purpose. *Machipongo Land and Coal Co., Inc. v. Commonwealth*, 569 Pa. 3, 799 A.2d 751 (2002).

■ If Hoffman had made out that the Property was so burdened that it had no economic use except to be mined for coal, it would have been entitled to a variance absent a showing that allowing it to mine within 1,000 feet would harm the health, welfare and safety of the community. Yet unlike the quarry owner in *Hersh*, who presented evidence that it would not be feasible to build and sell homes on the property, a real estate broker testified that the Property was physically unsuitable for any use other than quarrying, and Hoffman did not present any evidence showing that the Property could not be used or had no value whatsoever if it could not be mined for coal. Moreover, the Board found "that there are substantial health, safety and welfare issue which would weigh against a reduction of the 1,000 foot setback granting the variance" because the proposed mine is located on a steep incline above the residences allowing for debris and dust to enter the village, would include open holding ponds 12–14 feet deep adjacent to where children play, and that many of the residents have significant health problems, including asthma and other breathing problems. These findings were supported by the extensive testimony of the residents before the Board. Accordingly, the Board properly denied the validity variance.

**B.**

■ Hoffman contends that the Board erred because it should have considered the economic impact of the zoning restrictions in determining whether a setback variance should have been granted as the testimony before the Board established that approximately 220,000 tons of coal with a market value of $30 per ton would be lost if the 1,000 foot setback was applied, amounting to an economic detriment of at least $6,000,000. It contends that it

should be given a dimensional variance as a result. While it may suffer financial hardship, absent a showing that the Property cannot be used for other purposes, we do not know if the Property can be put to a use that would be in compliance with the zoning restrictions. In any event, the Board has found, based on substantial evidence, that granting a variance would be detrimental to the health, welfare and safety of the community.

Accordingly, the order of the trial court is affirmed.

### ORDER

AND NOW, this *15th* day of *October*, 2008, the order of the court of Common Pleas of Cambria County, dated October 29, 2007, is affirmed.