# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Delchester Developers, L.P., | : | |
| Appellant | : | |
| | : | |
| v. | : | Nos. 86 C.D. 2016 and 87 C.D. 2016 |
| | : | Argued: October 17, 2016 |
| Zoning Hearing Board of the | : | |
| Township of London Grove and | : | |
| London Grove Township and | : | |
| Dominic DiFilippo, Ricco DiFilippo, | : | |
| and Lynn Soliwoda-DiFilippo | : | |

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
HONORABLE JOSEPH M. COSGROVE, Judge
HONORABLE JAMES GARDNER COLINS, Senior Judge

**OPINION BY**
**SENIOR JUDGE COLINS**                              **FILED:  May 9, 2017**

Before this Court are the consolidated appeals of Delchester Developers, L.P. (Delchester) of the December 18, 2015 order and the January 4, 2016 amended order of the Court of Common Pleas of Chester County (Trial Court) affirming the June 27, 2014 decision and order of the London Grove Township Zoning Hearing Board (ZHB) that denied Delchester zoning relief.  For the following reasons, we affirm the order of the Trial Court.[1]

---

[1] Where the trial court has taken no additional evidence, appellate review is limited to determining whether the zoning hearing board committed an error of law or a manifest abuse of discretion. *Hertzberg v. Zoning Board of Adjustment*, 721 A.2d 43, 46 (Pa. 2004).  An abuse of discretion will be found only where the zoning hearing board's findings are not supported by substantial evidence. *Id*.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*.

Delchester sought zoning relief for two lots located within the Township's Groundwater Protection District overlaying the Cockeysville Marble area. (ZHB Decision, Findings of Fact (F.F.) ¶37.) The Cockeysville Marble area is a geologic formation that allows water to move through it very quickly and is recognized to be under threat, which led to the adoption of stringent standards regulating stormwater runoff infiltration by the governing body. (*Id*., F.F. ¶¶35-36.) In recognition of the challenges posed by the Cockeysville Marble area, the Groundwater Protection District was enacted as an overlay district within which "special stormwater management measures are to be taken to ensure recharge, to prevent sinkhole formation, and to protect the groundwater from contamination." (London Grove Township Zoning Ordinance (ZO) § 27-1301; *Id*., F.F. ¶¶38-39.) In addition to being within the Groundwater Protection District overlay, Delchester's two lots are within two separate underlying zoning districts; one of Delchester's lots spans 2.58 acres in the Commercial-Interchange District (CI District), and the second lot spans 0.89 acres in the Industrial District. (ZHB Decision, F.F. ¶¶2-4.) The two lots have frontage on Old Baltimore Pike, where they are separated by a third parcel unrelated to the proposed development; however, the two lots are adjacent at the rear of the third parcel, forming essentially an irregular shaped horseshoe around the unrelated third parcel. (*Id*. F.F. ¶¶2, 5, 7.)

Delchester submitted a preliminary plan application (Plan) to develop the two lots with a drive-thru bank, a restaurant and attendant parking and access points. (*Id*. F.F. ¶¶6, 7.) The Plan does not propose merger of the two lots and instead seeks to develop the lots separately. (*Id*. F.F. ¶¶24, 83.) Due to the CI lot's limited frontage on Old Baltimore Pike, which prevents more than one vehicle

2

access point from Old Baltimore Pike onto the lot within the CI District, the Plan proposed an additional vehicle access point and drive on the lot within the Industrial District that would allow vehicle traffic access from the lot within the Industrial District to the parking area located on the CI lot. (*Id*., F.F. ¶¶7, 25.) The Township of London Grove's (Township) Zoning Ordinance (ZO) does not require an access point in addition to the proposed driveway providing access onto the CI lot from Old Baltimore Pike. (*Id*., F.F. ¶75.) The Plan does not propose any additional current improvements to the lot within the Industrial District. (*Id*., F.F. ¶7.) In order to execute its Plan, Delchester sought several variances and special exceptions from the ZHB, and brought challenges to the validity of several provisions of the applicable ordinances, including the ZO, and interpretations of ZO provisions as applied to the lots. Prior to the instant matter, the ZHB issued a 2008 decision, which was not appealed, denying Delchester's request for a special exception to locate an internal access drive crossing the Industrial lot and granting Delchester's request for a variance permitting the CI lot to exceed the maximum impervious surface area by two percent and to provide two percent less than the required open space. (*Id*., F.F. ¶¶9-11.)

In the instant matter, the ZHB denied Delchester the relief it sought with a June 27, 2014 decision consisting of 88 findings of fact, 31 conclusions of law, and a lengthy discussion of its reasoning. Delchester appealed the ZHB's decision to the Trial Court. The Trial Court did not take additional evidence and instead relied upon the findings of fact and credibility determinations made by the ZHB. In a lengthy and thorough opinion ably crafted by the Honorable William P. Mahon, the Trial Court affirmed the ZHB.

3

On appeal, Delchester raises the following issues for review: (i) whether the Trial Court erred in concluding that the ZHB lacked jurisdiction to decide Delchester's substantive validity challenge to the Township's Stormwater Management Ordinance (SWMO); (ii) whether the Trial Court erred in concluding that the "net out" provision in the ZO is valid; (iii) whether the Trial Court erred in concluding that the word "site" as used in the ZO is synonymous with the word "lot" as that term is defined in the ZO; and (iv) whether the Trial Court erred in concluding that the proposed driveway accessing the Industrial lot is an "internal access drive" as that term is defined in the ZO. Delchester has not challenged any of the findings of fact made by the ZHB that were relied upon by the Trial Court, instead framing the issues for appellate review as pure questions of law.

## I.

The first issue raised by Delchester concerns the jurisdiction of the ZHB to determine the validity of a challenge to the Township's SWMO. Delchester argues that the SWMO is a land use ordinance and, therefore, the Trial Court erred when it affirmed the ZHB's determination that it did not have jurisdiction to hear Delchester's challenge to the SWMO.

All local jurisdictions are required to comply with the Municipalities Planning Code[2] (MPC) when enacting land use ordinances within their jurisdictions. While the MPC provides local jurisdictions with authority to enact many substantive provisions in their land use ordinances specific to their community, the MPC contains significant procedural mandates to provide a unified framework throughout the Commonwealth within which local government actors and private property owners can execute planning and development decisions and

---

[2] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101 – 11202.

4

resolve problems or conflicts that may arise during the development process. As a part of this procedural framework, Section 909.1(a)(1) of the MPC[3] provides the ZHB with jurisdiction to hear substantive validity challenges to land use ordinances. 53 P.S. § 10909.1(a)(1). Pursuant to the MPC, therefore, the ZHB's jurisdiction to hear a challenge to the substantive validity of a local ordinance turns upon whether that ordinance is a "land use ordinance."

In the instant matter, Delchester argues that the SWMO is a land use ordinance because the SWMO regulates the size, height and location of stormwater facilities constructed as a part of development and because compliance with the SWMO is required for land development approval in the Township. The Township contends that the SWMO regulates activity rather than use and that the purpose of the SWMO is to regulate stormwater and minimize water pollution. The Township argues that the SWMO is not a land use ordinance as that term is defined in Section 107 of the MPC and, therefore, pursuant to Section 1601(f) of the Second Class Township Code (Code)[4], Delchester must bring any challenge to the substantive validity of the SWMO in the court of common pleas. 53 P.S. § 10107; 53 P.S. § 66601(f).

Section 107 of the MPC defines "land use ordinance" as "any ordinance or map adopted pursuant to the authority granted in Articles IV, V, VI and VII." 53 P.S. § 10107. Article IV of the MPC provides for the adoption of official maps, Article V provides for the adoption of subdivision and land

---

[3] Added by the Act of December 21, 1988, P.L. 1329, *as amended by* the Act of July 4, 2008, P.L. 319.

[4] Act of May 1, 1922, P.L. 103, *as amended*, 53 P.S. §§ 65101-68701. Section 1601(f) of the Second Class Township Code provides "Any person aggrieved by the adoption of any ordinance may make complaint as to the legality of the ordinance to the court of common pleas." 53 P.S. § 66601(f).

development ordinances (SALDOs), Article VI provides for the adoption of zoning ordinances and maps, and Article VII provides for the adoption of ordinances regulating the development of Planned Residential Developments (PRD).  53 P.S. §§ 10401-10408, 10501-10516, 10601-10621, 10701-10713.

Section 103 of the Township's SWMO sets forth the statutory authority for the SWMO and provides:

> In the enactment of this Ordinance, it is the legislative intent of the Board of Supervisors to implement the policies set forth in various statutes of the state and federal governments, **including but not limited to the Pennsylvania Clean Streams Law**, Act of June 22, 1937, P.L. 1987, as amended, 35 P.S. Section 691.1, et seq.; **the Pennsylvania Storm Water Management Act**, Act of October 4, 1978, P.L. 864, No. 167, as amended, 32 P.S. Section 680.1 et seq.; Chapter 93, **Water Quality Standards**, Title 25, Rules and Regulations, Part I, Department of Environmental Resources, Sub-Part C, Protection of Natural Resources, Article II – Water Resources; Chapter 102 **Regulations and Authorities under the Clean Streams Law**, 35 P.S. Section 691.20 et seq.; and the **Federal Water Pollution Control Act, commonly known as the Clean Water Act**, 33 U.S.C. Section 1251 et seq.

(SWMO § 20-103 (emphasis added).)  Delchester contends that the language "including but not limited to" demonstrates that the Board of Supervisors did not intend the statutory authority identified in this provision of the SWMO to be exclusive.[5]  The MPC is not listed as providing statutory authority for the Board of Supervisors's enactment of the SWMO.  However, neither the absence of the MPC

---

[5] Delchester also notes that the Board has now amended the SWMO to cite the MPC as providing statutory authority for the SWMO although the amendment was not applicable when Delchester sought zoning relief.

6

in the list of statutory authority nor the inclusion of the language "including but not limited to" is determinative, as "the stated intent of a municipality is not controlling with respect to the question of whether the substance of an ordinance renders it a zoning ordinance." *Land Acquisition Services, Inc. v. Clarion County Board of Commissioners*, 605 A.2d 465, 469 (Pa. Cmwlth. 1992).

In *Land Acquisition Services*, this Court examined whether a hazardous waste ordinance was a "land use ordinance" within the meaning of, and therefore subject to, the MPC, and held that "[b]ecause the ordinance at issue here has as its primary objective the regulation of hazardous waste disposal activity, and because the terms of the ordinance go no further than the 'scope of that goal,' our conclusion is that the ordinance is not a zoning regulation." *Id*. at 470. In reaching its holding, this Court reasoned in *Land Acquisition* that while different types of ordinances may utilize land use tools, such as setbacks, the exclusive hallmark of land use ordinances are provisions that have as their primary purpose the regulation of land pursuant to the powers granted by Articles IV-VII of the MPC, stating "setbacks are not exclusively hallmarks of zoning. The distinctive characteristic of zoning involves zones." *Id*. at 470 (internal quotation omitted); *see also Taylor v. Harmony Township Board of Supervisors*, 851 A.2d 1020, 1026 (Pa. Cmwlth. 2004) (the MPC did not apply to ordinance regulating logging and timber, the primary purpose of which was to regulate timber harvesting in slide-prone and flood-prone areas); *IA Construction Corporation v. Township of Bradford, Clearfield County*, 598 A.2d 1347, 1351 (Pa. Cmwlth. 1991) (ordinance regulating solid waste activity was not a zoning ordinance).

The analysis held controlling in *Land Acquisition* is equally applicable to Delchester's substantive validity challenge to the SWMO. In determining

7

whether a local ordinance is a "land use ordinance" within the meaning of the MPC and, therefore, subject to the procedural framework mandated by the MPC, we must look first at the purpose of the SWMO and then examine whether the SWMO stays within the limits to which that purpose extends or goes beyond its scope.

The purpose of the SWMO is to regulate stormwater traveling through and within the Township. As the Pennsylvania Storm Water Management Act makes clear, it is impossible to regulate the movement of water without also regulating the disturbance of earth. *See* 32 P.S. §§ 680.11, 680.13. It necessarily follows that the Township's SWMO contains provisions addressing both the natural and the built environment; conversely, the Township's SALDO and ZO contain provisions addressing the movement of water and the impact of the built environment on the natural environment. These shared concerns do not render the SWMO a land use ordinance within the meaning of the MPC. The Township's SWMO is not an official map. The Township's SWMO does not divide all the land within the municipality into zones or regulate specific uses permitted within each zone like a zoning ordinance. Likewise, the Township's SWMO does not provide for the division and redivision of a lot and the location and bulk of structures constructed within those lots like a SALDO. Nor does the SWMO provide for an area of land to be developed as a single large scale entity in accordance with a plan intended to supersede the underlying zoning like a PRD ordinance.

What the SWMO does do is utilize some of the same techniques as land use ordinances as that term is defined by Section 107 of the MPC to achieve its goal of regulating stormwater. For example, like a land use ordinance, the

8

Township's SWMO regulates the size, height, and location of stormwater facilities and details instances where setbacks or buffers are required. However, the fact that the Township's SWMO utilizes a set of tools also found at work in ZOs and SALDOs does not make all three types of ordinances land use ordinances any more than a socket wrench used by both a mechanic and a plumber means that they are engaged in the same trade. The primary purpose of the Township's SWMO is not the regulation of land pursuant to the powers granted by Articles IV-VII of the MPC. The primary purpose of the Township's SWMO is the regulation of stormwater and the tools it uses to do so does not carry the SWMO beyond the scope of that goal. As we held in *Land Acquisition*, the use of regulatory tools utilized in land use ordinances does not bring an ordinance addressing a wholly different purpose into conflict with the MPC. Accordingly, the MPC does not provide the ZHB with jurisdiction to hear a substantive validity challenge to the Township's SWMO; the Township's SWMO does not traverse beyond the scope of its goal of regulating stormwater to intrude into territory demarcated by Section 107 of the MPC as the exclusive province of land use ordinances. Therefore, pursuant to Section 1601(f) of the Code, any challenge to the validity of the SWMO must be made in an original action in the court of common pleas. 53 P.S. § 10107; 53 P.S. § 66601(f).

## II.

Next, Delchester argues that the Trial Court erred in concluding that the "net out" provision in the Township's ZO is valid.[6] The ZO defines "lot area, net," as follows:

---

[6] Although Delchester also sought a validity variance below, Delchester has limited the issue before this Court to whether the "net out" provision survives constitutional scrutiny and has not sought to demonstrate that it has satisfied the criteria for a validity variance. In *Nowicki v.*

*Zoning Hearing Board of the Borough of Monaca*, 91 A.3d 287 (Pa. Cmwlth. 2014), we reviewed the law applicable to a validity variance, stating:

> A variance "where an unnecessary hardship is shown because of the confiscatory nature of a zoning ordinance is often referred to as a 'validity variance.'" *Laurel Point Associates v. Susquehanna Township Zoning Hearing Board*, 887 A.2d 796, 801 (Pa. Cmwlth. 2005) ("in a 'validity variance' case, the key is the actuality of confiscation, and confiscation is the unnecessary hardship."). The term "validity variance" is a misnomer in that it implies that this subset of variances is separate and apart or requires a showing different than that required for granting a "normal" variance. However, whether an applicant terms the variance sought as a "validity variance" or not, like all other variances, it will only be granted where an unnecessary hardship is demonstrated and the relevant criteria from Section 910.2 of the MPC[, added by the Act of December 21, 2988, P.L. 1329, 53 P.S. § 10910.2] has been satisfied. *Hunt v. Zoning Hearing Board of Conewago Township*, 61 A.3d 380, 384 (Pa. Cmwlth. 2013). The only distinction with a difference among variances, be it use, dimensional or validity, is the criteria from Section 910.2 of the MPC that is considered relevant. *Hertzberg*....This Court has held that, at a minimum, an applicant for a variance due to the confiscatory nature of the ordinance is required to show that: (1) the effect of the regulations complained of is unique to the property and not merely a difficulty common to other lands in the neighborhood; and (2) the regulation is confiscatory in that it deprives the owner of the use of the property. *Hoffman Mining Company, Inc. v. Zoning Hearing Board of Adams Township*, 958 A.2d 602, 612 (Pa. Cmwlth. 2008). This burden is the burden required under Subsections (1) and (2) of Section 910.2 of the MPC, albeit with the necessary modification that it is the unique effect of the regulation on the property, rather than the unique physical conditions, which creates the unnecessary hardship, or confiscation, and that a variance is needed to allow a reasonable use of the land, or to avoid confiscation.

*Nowicki*, 91 A.3d at 293-294. Rather than argue that it has demonstrated the criteria applicable under Section 910.2 of the MPC, Delchester has made a generalized constitutional argument that it has been denied substantive due process. While the analysis of whether a validity variance should be granted and whether an ordinance violates a property owner's substantive due process rights are similar and must be raised before the zoning hearing board in the first instance, each is a distinct legal issue, as is the additional question of whether a regulation found valid under a substantive due process analysis nevertheless fails to pass constitutional muster because the ordinance works a taking without just compensation.

The area of land contained within the limits of the legally described property lines bounding the lot, **exclusive of any existing or proposed** street or railroad rights-of-way, common open space, private easements, **easements for the purposes of access, utility (above or on the ground) or stormwater management including infiltration areas, prohibitive steep slopes, floodplain, floodway, and wetlands** as defined by this Ordinance. Unless otherwise specified, where the term "lot area" is used in this Ordinance, it shall be construed to mean net lot area.

(ZO § 27-202 (emphasis added).) Delchester argues that this provision is constitutionally infirm because it is not substantially related to the legitimate interest it purports to serve. Delchester contends that under the "net out" provision it is required to (a) design stormwater management facilities to serve its proposed development, (b) calculate the area for those facilities, and (c) exclude that area from the buildable lot area for the proposed development and that the effect of these requirements is to then preclude the very development for which the stormwater facilities were designed. Delchester further contends that the confiscatory nature of the "net out" provision is exacerbated by the requirement contained in the Township's SWMO that an above-ground stormwater basin be limited to a depth of two feet. (*See* SWMO § 20-303.) Delchester's argument that the "net out" provision is invalid implicates its rights under Article I, Sections 1 and 10 of the Pennsylvania Constitution and the Fifth and Fourteenth Amendments to the United States Constitution to substantive due process and to not have its property taken without just compensation. *Appeal of White*, 134 A. 409 (Pa. 1926).[7] The Township argues that the "net out" provision is a reasonable site

---

[7] In *Appeal of White*, our Supreme Court distinguished the power of "eminent domain" from the "police power" as follows:

11

specific means to regulate density and to serve the stated purpose of the ZO to preserve the environment, protect natural resources, and prevent flooding. The Township argues that Delchester failed to meet its burden of proof by demonstrating that the "net out" requirement was invalid.

> "Police power" should not be confused with that of eminent domain. Police power controls the use of property by the owner, for the public good, its use otherwise being harmful; while "eminent domain" and taxation take property for public use. Under eminent domain, compensation is given for property taken, injured, or destroyed, while under the police power no payment is made for a diminution in use, even though it amounts to an actual taking or destruction of property. Under the Fourteenth Amendment, property cannot be taken except by due process of law. Regulation under a proper exercise of the police power is due process, even though a property in whole or in part is taken or destroyed. The conditions on which its legitimate exercise is predicated should actually exist or their happening be so likely that restraint is necessary, similar to a court issuing a restraining order for injuries done or threatened to persons or property. Likewise, there should be a reasonable and substantial relation between the thing acted on and the end to be attained, one that promotes health, safety, or general welfare, necessary to the common good, and a reasonable demand for regulation, not one that is merely an unnecessary "experimentation or interference with the fundamental rights of the individual."

*Id*. at 411 (citation omitted). This distinction between the power of eminent domain and the police power is also crucial to the jurisdictional path traveled by claims alleging that a land use ordinance violates due process of law or constitutes a taking in Pennsylvania. Unlike a claim where the government has condemned private property or a *de facto* condemnation has been alleged, the Eminent Domain Code, Act of May 4, 2006, P.L. 112, 26 Pa. C.S. §§ 101-1106, does not provide a complete and exclusive remedy. *Machipongo Land and Coal Co., Inc. v. Commonwealth, Department of Environmental Resources*, 676 A.2d 199, 203 (Pa. 1996). Instead, because a land use ordinance is adopted pursuant to the police powers delegated to local jurisdictions by the MPC, and the MPC vests the zoning hearing board with jurisdiction in the first instance to hear substantive challenges to the validity of any land use ordinance, with limited exceptions, constitutional challenges, including those based on an assertion of a taking by a local entity without just compensation in the permitting context, originate before the zoning hearing board rather than within the court of common pleas.

12

Delchester's burden of proof is a heavy one. Property owners have a constitutional right to enjoy their property. U.S. Const. amends. V, XIV; Pa. Const. art. I § 1. However, townships may place reasonable limits on the right of private property owners to do what they wish with their property by enacting zoning ordinances in accordance with the township's police powers to protect the public health, safety, and welfare. Section 604 of the MPC, 53 P.S, § 10604; *In re Realen Valley Forge Greenes Associates*, 838 A.2d 718, 727-729 (Pa. 2003); *Penn Street, L.P. v. East Lampeter Township Zoning Hearing Board*, 84 A.3d 1114, 1134 (Pa. Cmwlth. 2014). A zoning ordinance is presumed to be constitutional unless the party challenging the ordinance demonstrates that the ordinance is unreasonable, arbitrary, or not substantially related to a township's power to protect the public health, safety, and welfare. *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365 (1926); *BAC, Inc. v. Board of Supervisors of Millcreek Township*, 633 A.2d 144, 146-147 (Pa. 1993); *Keinath v. Township of Edgmont*, 964 A.2d 458, 462 (Pa. Cmwlth. 2009); *Fisher v. Viola*, 789 A.2d 782, 785 (Pa. Cmwlth. 2001). In examining whether the ordinance is a valid exercise of the police powers, reviewing courts employ a substantive due process analysis, balancing the public interest to be served by the ordinance against the confiscatory or exclusionary impact of the ordinance on individual property rights; however, where the validity is debatable, it is the legislature's judgment that must control. *Boundary Drive Associates v. Shrewsbury Township Board of Supervisors*, 491 A.2d 86, 90 (Pa. 1985); *Penn Street*, 84 A.3d at 1134.

## A.

Initially, we reject a threshold argument made by Delchester regarding the Trial Court's reliance on the ZHB's findings of fact. Delchester argues that the

13

issue of whether the "net out" provision is a valid ordinance is a pure question of law akin to whether a proposed use falls within a given category contained in a zoning ordinance. Whether a zoning ordinance crosses over from a legitimate exercise of the police power to an unreasonable restriction on an owner's private property rights is a question of law but it is not purely a legal question. Rather, because there is simply no precise formula for determining whether zoning ordinances regulating private property are valid across the board, absent a permanent physical invasion or deprivation of all economically beneficial use of the property, an analysis of the validity of a zoning ordinance must proceed on a case-by-case basis according to the specific statutory and factual background presented. *National Land & Investment Co. v. Kohn*, 215 A.2d 597, 607-608 (Pa. 1965); *Penn Street,* 84 A.3d at 1135; *McGonigle v. Lower Heidelberg Township Zoning Hearing Board*, 858 A.2d 663, 669 (Pa. Cmwlth. 2004).

At the heart of the statutory structure of the MPC—providing procedural mandates to ensure a fair and uniform process for land use planning and development while delegating most substantive regulation of land use to local jurisdictions—is a recognition by the General Assembly that what may be necessary and legitimate in one jurisdiction may be confiscatory and invalid in another. Different communities have different concerns, often due to localized natural features or patterns of density and growth. The localized nature of zoning and land use recognized by the General Assembly in structuring the MPC also informs the role the MPC preserves for the zoning hearing board and its provision for appellate review. Except upon motion by the challenging party or an absence of fact finding below, the trial court does not take additional evidence and the findings of fact made by the zoning hearing board "shall not be disturbed if

14

supported by substantial evidence." Section 1005-A of the MPC, added by the Act of December 21, 1988, P.L. 1329, 53 P.S. § 11005-A. Where the trial court does not take additional evidence, the trial court reviews the decision of the zoning hearing board with the same standard and scope as this Court does upon further appellate review and is limited to a determination of whether the zoning hearing board committed an abuse of discretion or error of law and, where the findings of fact are supported by substantial evidence, the trial court may not disturb the findings of the zoning hearing board. *Boundary Drive Associates*, 491 A.2d at 90; *Appeal of M.A. Kravitz Co., Inc.*, 460 A.2d 1075, 1081 (Pa. 1983); *Schwartz v. Philadelphia Zoning Board of Adjustment*, 126 A.3d 1032, 1035 & n.5 (Pa. Cmwlth. 2015); *In re Bartowski Investment Group*, *Inc.*, 106 A.3d 230, 238 (Pa. Cmwlth. 2014); *8131 Roosevelt Corp. v. Zoning Board of Adjustment of City of Philadelphia*, 794 A.2d 963, 970 (Pa. Cmwlth. 2002).

The introduction of constitutional issues into a challenge to a zoning ordinance does not alter the zoning hearing board's role as the fact finder or appellate review; an appellate court's analysis of legal issues raised before it that are dependent on the factual circumstances presented, rather than pure questions of law, must not usurp the zoning hearing board's role as finder of fact where substantial evidence in the record supports the board's findings. *In re Realen*, 838 A.2d at 731-732; *Appeal of M.A. Kravitz Co., Inc.*, 460 A.2d at 1081; *Schwartz*, 1126 A.3d at 1043-1045; *In re Bartowski Investment Group*, 106 A.3d 240-244; *8131 Roosevelt*, 794 A.2d at 969-970.[8] Where a party has challenged a legal

_____

[8] The role of the ZHB as fact-finder is also paramount in matters requiring an analysis of the related but distinct claim that a taking has occurred. *See, e.g., Dolan v. City of Tigard*, 512 U.S. 374 (1994); *Nollan v. California Coastal Commission*, 483 U.S. 825, 834-835 (1987); *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 125 (1978); *Machipongo Land and Coal Co., Inc. v. Commonwealth*, 799 A.2d 751, 769, 771 (Pa. 2002).

15

conclusion based in part on factual findings, but does not contend that the relevant facts are unsupported by substantial evidence, an appellate court may not act as the finder of fact under the guise of the plenary review reserved for pure questions of law. *In re Realen*, 838 A.2d at 731-732; *Jones v. Zoning Hearing Board of Town of McCandless*, 578 A.2d 1369, 1371-1372 & n.2 (Pa. Cmwlth. 1990).

In analyzing the issue of whether the "net out" provision was valid, the Trial Court applied the correct standard and scope of review. The Trial Court examined the findings of the ZHB and determined that there was substantial evidence in the record to support the ZHB's findings. (Trial Court Op. at 12-15.) Furthermore, the Trial Court found no grounds to support a conclusion that the ZHB capriciously disregarded evidence in resolving issues of credibility and the weight to be afforded the evidence of record. (*Id*.) Having determined that the ZHB did not capriciously disregard evidence and that the findings it made were supported by substantial evidence, the Trial Court examined the legal issues before it based upon the facts found by the ZHB. *Lamar Advertising of Penn, LLC v. Zoning Hearing Board of Borough Deer Lake*, 915 A.2d 705, 709 n.9 (Pa. Cmwlth. 2007) ("Upon reviewing a decision of a zoning hearing board, a court may not substitute its judgment for that of the board; and, assuming the record demonstrates substantial evidence, the court is bound by the board's findings which result from resolutions of credibility and the weighing of evidence rather than a capricious disregard for the evidence."); *see also In re Realen*, 838 A.2d at 731 (noting "an unbroken line of authorities which have limited the scope of judicial review of the findings of zoning hearing boards to a determination of whether those findings are supported by substantial record evidence."). Accordingly, we find no error in the Trial Court's reliance on the ZHB's findings of fact.

16

Turning to Delchester's argument that the "net out" provision is invalid because it violates Delchester's right to due process of law, we agree with Delchester that the "net out" provision, whether coupled with the SWMO two feet basin requirement or standing alone, is restrictive; however, we are not persuaded that it lacks a substantial relationship to the public health, safety, and welfare amounting to an invalid exercise of the police powers.

The practical effect of the "net out" requirement is to require Delchester to subtract the eased and constrained area of each lot and to use the remaining area in its calculation of what percentage of the lot may be developed. Delchester's argument that this provision is unconstitutional rests upon the premise that the provision puts a thumb on the scale upsetting the balance between property owners' rights and the protection of the public's health, safety and welfare and that, in light of this burden, the "net out" provision is unreasonable.

In support of its argument that the "net out" provision unreasonably restricts its property rights, Delchester cites *C&M Developers, Inc. v. Bedminster Township Zoning Hearing Board*, 820 A.2d 143 (Pa. 2002), but misapprehends the holding. In *C&M Developers*, our Supreme Court struck down an ordinance in Bedminster Township that permissibly required landowners of tracts greater than 10 acres to set aside between 50-60% of their agriculturally productive land but, additionally, impermissibly limited development of remaining land to one acre minimum lots on a buildable site area, which was defined by excluding watercourses, floodplains, floodplain soils, wetlands, lakes, or ponds. *Id*. at 158. Our Supreme Court's rejection of the second half of the Bedminster Township ordinance in *C&M Developers* was not based on the one acre requirement *per se* or

the exclusion of constrained lands in the calculation but on the one acre requirement being a matter of private preference and aesthetics rather than a restriction legitimately enacted to protect the public health, safety and welfare.[9] 820 A.2d at 158; *see also National Land*, 215 A.2d at 607-608 (likening every zoning ordinance to a "point along a spectrum," with the validity depending on whether the ordinance fell beyond that point where the regulation ceases to be of concern to the health and welfare of the general public and becomes a matter of private preference) .

The portion of the ordinance our Supreme Court concluded was permissible in *C&M Developers* had as its purpose the preservation of agricultural land and activities, a purpose for which the MPC mandates zoning ordinances shall be designed. 820 A.2d at 155; *see* Section 604(3) of the MPC, 53 P.S. § 10604(3). In setting forth the purpose of zoning ordinances in the Commonwealth, the MPC further provides that, *inter alia*, zoning ordinances shall be designed to: prevent overcrowding of land; loss of health, life, or property from flooding; protect and preserve wetlands, aquifers and flood plains; and promote, protect and facilitate the provision of a safe, reliable and adequate water supply. Section 604(1) and (2) of

---

[9] Our Supreme Court concluded in *C&M Developers* that:

> While we acknowledge that the [t]ownship has a legitimate interest in preserving its agricultural lands, we find that by requiring landowners of tracts greater than ten acres to set aside between fifty and sixty percent of the agriculturally productive land on their tracts, the [t]ownship reasonably meets that interest. By also limiting a landowner to developing homes on one-acre minimum lots on the buildable site area, however, the [t]ownship is no longer attempting to preserve agriculture, but rather, is improperly attempting to exclude people from the area and in so doing, is unreasonably restricting the property rights of the landowner.

820 A.2d at 158.

18

the MPC, 53 P.S. § 10604(1) & (2).[10]  Based on the findings of fact made by the ZHB, the "net out" provision is clearly aimed at mitigating threats to the public health, safety, and welfare—destruction of sensitive natural features, overcrowding of land, and harm from stormwater—identified by the MPC as issues local jurisdictions are mandated to address when adopting local zoning ordinances.  In addition, even if the "net out" provision did not fall squarely within the core[11]

---

[10] Moreover, the MPC provides that zoning ordinances may "permit, prohibit, regulate, restrict and determine," *inter alia*:

> (1) Uses of land, watercourses and other bodies of water.
>
> (2) Size, height, bulk, location, erection, construction, repair, maintenance, alteration, razing, removal and use of structures.
>
> (3) Areas and dimensions of land and bodies of water to be occupied by uses and structures, as well as areas, courts, yards, and other open spaces and distances to be left unoccupied by uses and structures.
>
> (4) Density of population and intensity of use.
>
> (5) Protection and preservation of natural and historic resources and prime agricultural land and activities.

Section 603(b) and (c) of the MPC, 53 P.S. § 10603(b),(c).  The MPC further provides that zoning ordinances may contain provisions to promote and preserve environmentally sensitive areas and "shall provide for protection of natural and historic features and resources."  Section 603(c)(7) and (g)(2) of the MPC, 53 P.S. § 10603(c)(7), (g)(2).

[11] In *In re Petition of Dolington Land Group*, 839 A.2d 1021 (Pa. 2003), our Supreme Court examined whether a township's conservation management zoning district regulations unreasonably restricted land owners' rights to develop their private property.  Prior to reaching its conclusion that the regulations were not unreasonably restrictive, the Court examined factors informing the substance of zoning ordinances that had previously been of little or no concern but in the time since its landmark decision in *Surrick v. Zoning Hearing Board of the Township of Upper Providence*, 382 A.2d 105 (Pa. 1977), had gained  preeminence, stating:

> These include but are not limited to an increased awareness of the environmental  sensitivity  and  public  value  of  undisturbed

19

purposes identified by the MPC as those for which local jurisdictions are authorized to use their police powers, the findings made by the ZHB clearly establish that the area where Delchester's lots are located rests upon a sensitive geological formation presenting unique challenges to the management of stormwater that necessitates careful development in order to mitigate harm to the public.

The "net out" provision is not the only means by which the Township could have sought to secure the public welfare from the dangers posed by overdevelopment within the Groundwater Protection District overlay. The Township could have, for example, utilized a gross tract provision coupled with a

> wetlands, floodplains, slopes, and woodlands; the growing national and state-wide awareness of the true costs of sprawl and of the need to implement contrary land use policies; and the growing recognition of the importance of agricultural lands and activities and of prime agricultural soils. Each of these factors acts to counterbalance to some extent the desire for intense development and each of these factors can properly serve in an appropriate municipal or multimunicipal context as a legitimate justification for the imposition of carefully tailored restrictions of the type, design, location, and intensity of permitted development.

*In re Petition of Dolington Land Group*, 839 A.2d at 1032. We do not intend to infer that the purposes of zoning ordinances identified in the MPC are the only purposes that may inform a local jurisdiction's enactment of zoning ordinances. The concerns that local jurisdictions determine should be addressed through zoning and other land use ordinances are not static, as reflected in *In re Petition of Dolington Land Group*, and the governing body of the local jurisdiction, as recognized by the MPC's structure, is in the best position to recognize new factors to inform the substance of zoning ordinances based on its experience and expertise. *Marchipongo*, 799 A.2d at 772 ("The rules and understandings as to the uses of land that are acceptable and unacceptable have changed over time. The fact that sewage was once strewn into city streets does not give rise to a permanent reasonable expectation that such behavior can continue indefinitely"). However, where it has been shown that the mischief to be remedied by a zoning ordinance is at the core of the purposes identified in the MPC, the argument that the ordinance goes beyond the bounds of the local jurisdiction's police powers becomes all the more difficult to substantiate.

20

higher limit on the permissible impervious surface area. However, whether or not there were other means to achieve the same ends as the Township has here is of no moment; such considerations are squarely within the judgment of the governing body. Instead, our review is limited to whether enactment of the "net out" provision was substantially related to the Township's authority to protect the public health, safety and welfare. To put it another way, a substantive due process analysis asks whether the entity exercising authority has the power to act towards a particular end and if so, does the means further that end or is it so divorced from the end that the connection to a valid exercise of authority is severed.

In the instant matter, the evidence presented before the ZHB demonstrated that the "net out" provision is substantially related to the Township's power to protect the public health, safety, and welfare and an outgrowth of the specific challenges presented by the location of the two lots; moreover, the evidence showed that the provision relies upon best practices within the engineering field, rather than an arbitrary view of how best to manage the infiltration of stormwater.

The ZHB found that the "net out" provision is intended to regulate density and protect constrained lands, and to do so in a more site specific manner than gross tract area calculations would allow, because the "net out" determination is based on the constrained lands unique to the particular property at issue.[12] (ZHB

---

[12] In the discussion section of its opinion, the ZHB credited the testimony of the Township Engineer, Ronald Ragan, and stated:

> The testimony heard by the Board [FN5] was that municipalities utilize different approaches in calculating lot coverage; some use gross lot area and some use net lot area. N.T. 201. The purpose of such provisions is they allow the municipality a way of limiting or controlling the density of commercial development on a lot. N.T. 199, 202. Such provisions are reasonable zoning requirements.

21

Decision, F.F. ¶¶28-33.) The "net out" provision impacts Delchester's private property rights by excluding easements Delchester is required to grant the Township for the purposes of access, utility (above or on the ground) or stormwater management including infiltration areas, prohibitive steep slopes, floodplain, floodway, and wetlands. (ZO § 27-202.) However, in regards to the

N.T. 199. London Grove Township's regulation reduces lot area by subtracting therefrom the area consumed by constrained lands. N.T. 202. This determines lot coverage and makes it more specific to the lot in question. N.T. 202. Net lot area is more site specific to environmental constraints on a particular lot. N.T. 204. Constrained lands include steep slopes, floodplains, wetlands, and easements. N.T. 205. The purpose for netting out such areas is that they can't otherwise be developed. N.T. 205. You can not develop areas that are eased for utilities. N.T. 205. It is easy to do the calculations. N.T. 206.

[FN5] The evidence before the Board also included reference to § 10604 of the MPC which sets forth zoning purposes to include preservation of the natural, scenic and historic values in the environment and preservation of forests, wetlands, aquifers and floodplains; the prevention of flooding. See Exhibit TP-12. The Township's Comprehensive Plan was entered into evidence. See Exhibit TP -13, N.T. 188 -189. It sets forth provisions related to natural resource protection goals to include protection of groundwater, floodplains, streams, wetlands, mature woodlands and specimen trees, steep slopes, stormwater management programs, open space considerations, best management practices for development regulations to assure that developments minimize off-site stormwater runoff, increase on site infiltration, encourage natural filtration functions, aquifer recharge protection, etc. See Exhibit TP - 13.

(ZHB Decision, Discussion at 17-18.)

22

easements required to permit the Township access to inspect and maintain stormwater facilities, the ZHB found that improperly maintained stormwater facilities can lead to "flooding, standing water in basins and represent a safety risk for children," and that the inspection and maintenance of stormwater facilities is necessary to prevent and protect the public from these dangers. (*Id.*, F.F. ¶¶20-22.)[13] Delchester's property rights are further impacted by the fact that the amount of land excluded from the area and bulk calculations applicable to the lot is determined in part by the type of stormwater management system Delchester is permitted to utilize, which is also subject to regulation by the ZO's requirement that the infiltration devices permitted shall not have a head of more than two feet. (ZO § 27-1406.8; *see also* SWMO § 20-303.) However, in regards to the ZO's requirement that "induced concentrated infiltration through infiltration devices for stormwater runoff shall not have a head of more than two feet in the Cockeysville Marble Area," the ZHB found that water travels through the Cockeysville Marble Area very quickly and that the aquifer within the Cockeysville Marble Area has been recognized as being under threat, a threat the governing body determined necessitated the adoption of best management practices developed by the Pennsylvania Department of Environmental Protection for the infiltration of stormwater runoff in the Township's Groundwater Protection District. (*Id.*; ZHB Decision, F.F. ¶¶34-36, 38, 41-42.) The ZHB further found that regulating infiltration of stormwater in the Groundwater Protection District is important to avoid contaminating the groundwater, reducing the risk of sinkholes, and protecting the aquifer and that limiting the head of infiltration devices to two feet

---

[13] In addition, the ZHB noted that the MPC provides analogous authority for including SALDO provisions that insure "adequate easements or rights-of-way shall be provided for drainage and utilities." Section 503(2)(iii) of the MPC, 53 P.S. § 10503(2)(iii); (ZHB Decision, F.FF. ¶19).

23

or less is a well-established standard for infiltrating stormwater within the engineering field, and thus an effective means of protecting the Cockeysville Marble area and regulating the quality and quantity of groundwater.[14]   (ZHB Decision, F.F. ¶¶39, 42-45.)

The Township has the authority to use its police powers to protect constrained lands, regulate density and ultimately mitigate the harm traced to stormwater.   The governing body enacted the "net out" provision to protect constrained lands, regulate density, and mitigate the harm stormwater poses to life and property.   The terms of the "net out" provision further the purpose of protecting constrained lands, regulating density, and mitigating the effect of stormwater.  The record here does not support a legal conclusion that the "net out" provision is unreasonable, arbitrary or not substantially related to the Township's power to protect the public welfare.   There is no support in the record for the conclusion that the burden on Delchester's ability to develop its property is such

---

[14] In its discussion of the evidence, the ZHB stated:

> A "head" is the distance between the bottom of an infiltration device to the discharge point.  N.T. 195, 197.  An infiltration device is used to handle stormwater to get it back into the ground.  N.T. 195.  The zoning ordinance allows a head of 2 feet in the Cockeysville Marble Area. Z/O, §27- 1406.8. N.T. 196 -197.  The greater the size of the head the greater the likelihood that too much water is forced into the ground such that the normal purifying properties of the upper layers of the ground are short-circuited which could contaminate the groundwater because the water moves very quickly through the Cockeysville Marble Are.  N.T. 195.  The head distance is important because it determines depth and weight of the water you are pushing into the ground. N.T. 195, 197.  If the depth is too 'great this has a tendency to over saturate or infiltrate or compress the soil so you lose some-of the functionality of the soil or you can create sink holes.
> N.T. 196.

(ZHB Decision, Discussion at 19)

that it outweighs the Township's exercise of its police powers. Moreover, we reject the contention that Delchester is precluded by the ZO from building the development for which the stormwater facilities were designed because it is required to subtract the nonbuildable area where the stormwater facilities are located from its calculation of impervious surface area; rather, Delchester is prohibited by the ZO from building the development for which the stormwater facilities were designed because the use of land proposed by Delchester overcrowds the land in the Groundwater Protection District overlay and threatens constrained native environmental features, increasing the likelihood of harm to life and property from stormwater. Accordingly, the Trial Court did not err in concluding that the "net out" provision withstood a substantive due process challenge.

## C.

The lack of a successful substantive due process challenge to the "net out" provision, however, does not end the constitutional scrutiny necessitated by Delchester's challenge. A substantive due process challenge to a land use ordinance is distinct from a challenge based upon a private property owner's rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, Section 10 of the Pennsylvania Constitution to just compensation for property taken by the government. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 542 (2005); *Machipongo*, 799 A.2d at 763, n.7 (noting that the Pennsylvania Constitution and United States Constitution are coextensive with regard to an analysis of whether a taking has occurred); *see also Commonwealth v. Gary*, 91 A.3d 102, 108 (Pa. 2014) (discussing coextensive constitutional analysis). In a takings analysis, we do not inquire into the underlying validity of the regulation,

25

for the Takings Clause presupposes that the ordinance was enacted in pursuit of a valid purpose. *Lingle,* 544 U.S. at 543; *Miller and Son Paving, Inc. v. Plumstead Township Bucks County*, 717 A.2d 483, 486 n.6 (Pa. 1998) (distinguishing a takings claim from a validity claim). Instead, the analysis inquires whether a "nexus" and "rough proportionality" exists between the property that the government demands in the permitting process and the social costs to the public from the proposed development, such that it is permissible to condition development approval upon the dedication of private property without payment of just compensation. *Koontz v. St. Johns River Water Management District*, __ U.S.__, __, 133 S. Ct. 2586, 2595 (2013); *Lingle*, 544 U.S. at 538-540; *Dolan v. City of Tigard*, 512 U.S. 374 (1994); *Nollan v. California Coastal Commission*, 483 U.S. 825, 834-835 (1987). The Takings Clause does not mandate that government purchase land every time it has enacted regulation that impacts private property rights; rather, it inquires whether the valid requirement that a property owner mitigate the impact of a proposed development becomes invalid by demanding too much from the individual property owner in furtherance of this goal.[15]

---

[15] *See Koontz*, __ U.S. at __, 133 S. Ct. at 2595 ("Insisting that landowners internalize the negative externalities of their conduct is a hallmark of responsible land-use policy"; the Takings Clause allows permitting authorities to "insist that applicants bear the full costs of their proposals while still forbidding the government from engaging in 'out and out…extortion'"); *Keystone Bituminous Coal Association v. DeBenedictis*, 480 U.S. 470, 490-491 (1987) ("Under our system of government, one of the State's primary ways of preserving the public weal is restricting the uses individuals can make of their property. While each of us is burdened somewhat by such restrictions, we, in turn, benefit….'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community,' and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it." (internal citations omitted)); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922) ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As

The United States Supreme Court has termed the takings precedent applicable to Delchester's challenge to the "net out" provision the doctrine of "unconstitutional conditions." Unconstitutional conditions cases generally arise in the context of the subdivision and land development permit approval process, where the permit is either granted with conditions or denied, and the issue is whether the conditions attached to the grant or not satisfied in the denial amount to unconstitutional exactions; however, in the context of an application for zoning relief, the issue of whether a requirement in an ordinance represents an unconstitutional condition may also arise. The issue in the instant matter is whether the requirement in the Township's ZO conditioning Delchester's right to proceed with its proposed development on Delchester's grant of an easement to the Township for inspection and maintenance of its stormwater facilities and exclusion of that eased portion of the property in its calculation of the area permitted to contain impervious surfaces bears an essential nexus to the Township's legitimate interest in regulating stormwater and a rough proportionality to the impact of Delchester's proposed development on that interest. Under this formulation, Delchester likens the portions of its property eased and restricted by the "net out" provision to a dedication of its property for a public use. The United States Supreme Court's decisions in *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994), are particular instructive regarding this issue.

---

long recognized some values are enjoyed under an implied limitation….But obviously the implied limitation must have its limits…. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act.").

In *Nollan*, the California Coastal Commission conditioned a permit sought by the applicants to demolish an existing bungalow and replace it with a three-story residence upon the applicants' grant of a lateral public easement. 483 U.S. at 828. The California Coastal Commission asserted that the easement was necessary because the legitimate state interest of preserving visual access to the ocean for the public would be diminished by the applicants' use of their property to develop a large residence. *Id.* The Court held that the permit condition was unconstitutional without payment of just compensation because the California Coastal Commission imposed a burden of providing permanent lateral access for the public across the applicants' property, a condition which had no nexus to the purpose of protecting the public's visual access to the ocean. *Id.* at 837. In reaching its holding, the Court reasoned that had the applicants been required to "make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach, rather than conditioning their permit to rebuild their house on their agreeing to do so," there would have been a taking. *Id.* at 831. However, the condition would be constitutional even if it required the applicants to:

> Provide a viewing spot on their property for passersby with whose sighting of the ocean their new house would interfere. Although such a requirement, constituting a permanent grant of continuous access to the property, would have to be considered a taking if it were not attached to a development permit, the Commission's assumed power to forbid construction of the house in order to protect the public's view of the beach must surely include the power to condition construction upon some concession by the owner, even a concession of property rights, that serves the same end. If a prohibition designed to accomplish that purpose would be a

legitimate exercise of the police power rather than a taking, it would be strange to conclude that providing the owner an alternative to that prohibition which accomplishes the same purpose is not.

The evident constitutional propriety disappears, however, if the condition substituted for the prohibition utterly fails to further the end advanced as the justification for the prohibition…. In short, unless the permit condition serves the same governmental purpose as the development ban, the building restriction is not a valid regulation of land use but "an out-and-out plan of extortion."

*Id*. at 836-837 (citations omitted). Having concluded that the condition that the applicants provide permanent lateral access across their property to the public did not have an essential nexus with the California Coastal Commission's legitimate state interest in protecting the public's view of the ocean, the Court held that either the condition must be removed or just compensation must be paid to the applicants for the easement. *Id*. at 841. As a consequence of holding that there was no nexus between the permit condition and the California Coastal Commission's legitimate interest in protecting the public's view of the ocean, it was not necessary for the Court to address the next part of the unconstitutional conditions doctrine: whether the record demonstrated the required degree of connection between the burden imposed on the applicants' property rights by the challenged condition and the projected impact of the proposed development on the government's legitimate interest. *Id*. at 841; *see also Dolan*, 512 U.S. at 386.

Unlike in *Nollan*, the conditions placed on zoning approval of Delchester's proposed development by the "net out" provision—granting an easement to the Township for inspection and maintenance of the stormwater facilities, limiting the head of the infiltration devices Delchester may utilize, and

excluding the eased portion of the lot from impervious surface calculations—have an essential nexus with the impact of Delchester's proposed development. The two lots Delchester seeks to develop are located in a zoning district with an underlying geology that fuels a quantity and velocity of stormwater which presents a hazard to the public. The "net out" provision is a direct attempt to mitigate any external harm to the public by internalizing the impact of the increased impervious surfaces that must necessarily result as a part of Delchester's development of its property. There is nothing to suggest that, like the lateral easement in *Nollan*, the "net out" provision imposes conditions that fail to further the regulation of stormwater and instead seek to advance an agenda unrelated to the impact of Delchester's proposed development. Therefore, we must examine whether a rough proportionality exists between the development restrictions imposed by the "net out" provision and the impact of Delchester's proposed development.

The United States Supreme Court's decision in *Dolan* is distinguishable from *Nollan* in that the issues presented did require the Court to address the second part of the constitutional conditions doctrine and to examine whether the record evidenced a rough proportionality between the condition imposed and the interest to be served. 512 U.S. at 388, 391. The applicant in *Dolan* sought a permit to reconfigure the permitted use on her property by razing her existing commercial building, constructing a new building double in size to house that commercial use along with a paved parking lot, and constructing an additional complementary commercial use with parking. *Id*. at 379. Applicant's permit was granted by the city on the condition that applicant dedicate a portion of her property lying within the 100-year floodplain for improvement of a storm drainage system along an adjacent creek, dedicate a portion of her property fifteen

feet above the floodplain boundary as a pedestrian/bicycle path, and design the proposed development so as not to intrude upon the combined areas, which would form a public greenway. *Id*. at 380, 388. The zoning district within which applicant's property was located also required applicant to meet a fifteen percent open space and landscaping requirement, which could be met in part by the dedications. *Id*. at 380.

Addressing the first prong of the unconstitutional conditions analysis, the Court concluded that an essential nexus existed between the conditions imposed by the city and the city's legitimate interest in the prevention of flooding around the creek and the reduction of traffic congestion in the zoning district where the property was located. *Dolan*, 512 U.S. at 387. The Court next examined whether the conditions demanded in exchange for permit approval bore the required relationship to the impact of the applicant's proposed development. *Id*. at 388. In concluding that the rough proportionality required for the city to impose the permit conditions without the payment of just compensation was lacking, the Court stated:

> It is axiomatic that increasing the amount of impervious surface will increase the quantity and rate of storm water flow from [applicant's] property. Therefore, keeping the floodplain open and free from development would likely confine the pressures on Fanno Creek created by [applicant's] development. In fact, because [applicant's] property lies within the Central Business District, the [zoning ordinance] already required that [applicant] leave 15% of it as open space and the undeveloped floodplain would have nearly satisfied that requirement. But the city demanded more-it not only wanted [applicant] not to build in the floodplain, but it also wanted [applicant's] property along Fanno Creek for its greenway system.

31

> The city has never said why a public greenway, as
> opposed to a private one, was required in the interest of
> flood control.
>
> The difference to [applicant], of course, is the loss of her
> ability to exclude others. As we have noted, this right to
> exclude others is "one of the most essential sticks in the
> bundle of rights that are commonly characterized as
> property." It is difficult to see why recreational visitors
> trampling along [applicant's] floodplain easement are
> sufficiently related to the city's legitimate interest in
> reducing flooding problems along Fanno Creek, and the
> city has not attempted to make any individualized
> determination to support this part of its request.

*Id*. at 393 (internal citations omitted). The Court contrasted the conditioning of the permit on the provision of a public greenway in *Dolan* with the hypothetical instance where the proposed development for which the permit was issued somehow encroached upon an existing public greenway, concluding that such an encroachment would evidence the type of proportional relationship between the impact of the proposed development and the city's legitimate interest that was lacking in the factual record before it in *Dolan*. *Id*. at 395. Similar to its conclusion regarding the greenway, the Court concluded that the factual findings underlying the imposition of the bicycle/pedestrian path were lacking because rather than being rooted in a finding that the path could or was likely to offset some of the traffic issues in the district, the evidence concerning the impact of the path on traffic demands straining the district was merely speculative. *Id*. at 396. Accordingly, the Court held that by imposing the conditions it did upon the grant of applicant's permit, the city traversed the outer limits of permissible land use planning by burdening applicant's constitutional rights to achieve ends unrelated to

32

the impact of applicant's proposed development without the payment of just compensation. *Id*. at 396.

The burden placed upon Delchester's property by the "net out" provision is quite distinguishable from the unconstitutional condition imposed in *Dolan*; unlike the city in *Dolan*, the Township here has not "demanded more." *Id*. at 393. First, the impervious surface requirement in the "net out" provision is a limitation on Delchester's use of its property rather than an exaction; the portion of the property that cannot be built upon because of the need to mitigate the quantity and velocity of stormwater remains in Delchester's possession and control, and Delchester retains the right to exclude, as well as enjoy or dispose of the property. Second, the requirement that Delchester limit the head of the infiltration devices it utilizes to mitigate stormwater effects no taking. While the limitation may lead to an increase in the amount of land that must be eased for inspection and maintenance by the Township under the "net out" provision, any increase in the amount of eased property is a direct outgrowth of Delchester's actual use of the property. Moreover, unlike the factual findings underlying the imposition of the bicycle/pedestrian path in *Dolan*, the findings made by the ZHB in support of the two-foot head limitation demonstrates that the requirement is rooted in best engineering practices in response to the difficulty of infiltration specific to the geography of Delchester's property, rather than mere conjecture. Finally, the requirement that Delchester ease the land containing the stormwater facilities once they are constructed places a minimal burden on Delchester's right to exclude and has no impact on the remainder of the sticks in Delchester's bundle of property rights. The Township's right to enter Delchester's property is narrowly defined by the easement, which expressly limits entry to inspection and maintenance of the

33

stormwater facilities. No member of the general public is granted a right of entry due to the easement. In addition, the size of the easement is directly controlled by Delchester's decisions on how to use and develop its property, rather than a generalized one-size-fits-all mandate.

Ultimately, the rough proportionality prong of the "unconstitutional conditions" test questions whether the conditions imposed by the "net out" provision on Delchester's use of its property has gone too far such that it no longer merely mitigates the impact of Delchester's proposed development but instead requires Delchester to bear a public burden that the constitutions of the United States and this Commonwealth require the public at large to bear. The conditions here do not. Instead, the "net out" provision functions as a tailored, flexible restraint on use of property that is at minimum roughly proportional to the impact of that particular use. Accordingly, we hold that the "net out" provision furthers the Township's legitimate interest in the mitigation of the hazards posed by stormwater and contains the essential nexus and rough proportionality to the impact of Delchester's proposed development on that interest to withstand constitutional scrutiny.

## III.

Next, Delchester argues that the interpretation of the word "site" in Section 1406.7 of the ZO as synonymous with the term "lot" is erroneous. Section 1406.7 of the ZO provides:

> Continued groundwater recharge is to be assured through diffuse infiltration through upper soil horizons, through wooded ground, grassy areas, and infiltration berms, impervious coverage of **sites** in or partially in the [Groundwater Protection District] shall not exceed 50 percent of the portion that is within the carbonate area.

34

(ZO § 27-1406.7) The ZO does not contain a definition for the word "site." The ZO does define the word "lot" as "a parcel of land described by metes and bounds, deed descriptions, or an approved subdivision." (*Id.* § 27-202.) Delchester contends that to treat the two terms "lot" and "site" as synonymous where "lot" is specifically defined in the ZO and "site" is not runs afoul of the principles of statutory construction. Delchester argues that under the ZO the term "site" is used to refer to a development as a whole and is not synonymous with each individual "lot" within a proposed development. As a result of this interpretation, Delchester contends that the impervious surface limitation within the Groundwater Protection District overlay should be calculated over both lots, rather than each individually, because together the lot within the CI District and the lot within the Industrial District constitute one site. The Township argues that Delchester's Plan treats each individual "lot" as a "site" because it reserves the right to develop the lot within the Industrial District in the future and utilizes that lot in its Plan merely to provide an internal access drive. The Township contends that Delchester's intent to develop the CI and Industrial lots separately instead of as one "site" requires each lot to meet the applicable impervious surface coverage limitations.

It is axiomatic that the principles of statutory construction apply to the interpretation of zoning ordinances. *Borough of Fleetwood v. Zoning Hearing Board of Borough of Fleetwood*, 649 A.2d 651, 656 (Pa. 1994).[16] The words and phrases of zoning ordinances shall be construed according to their common and approved usage and in accordance with the rules of grammar; undefined terms in a zoning ordinance must be given their plain, ordinary meaning. 1 Pa. C.S. §

---

[16] *See also* Statutory Construction Act of 1972, Act of December 6, 1972, P.L. 290, 1 Pa.C.S. §§ 1501-1991.

35

1903(a). Furthermore, a zoning ordinance shall be construed, if possible, to give effect to all of its provisions. 1 Pa. C.S. § 1921. The guiding principle in interpreting land use ordinances requires ambiguous language in an ordinance to be construed in favor of the property owner and against any implied extension of the restriction; however, such an interpretation is unwarranted where "the words of the zoning ordinance are clear and free from any ambiguity." *Borough of Fleetwood*, 649 A.2d at 657; *City of Hope v. Sadsbury Township Zoning Hearing Board*, 890 A.2d 1137, 1143 (Pa. Cmwlth. 2006). Finally, because the zoning hearing board is the entity charged with the interpretation and application of a zoning ordinance, a board's interpretation of its own ordinance is entitled to great weight and deference. *Broussard v. Zoning Board of Adjustment of City of Pittsburgh*, 907 A.2d 494, 500 (Pa. 2006); *Kohl v. New Sewickley Township Zoning Hearing Board*, 108 A.3d 961, 968 (Pa. Cmwlth. 2015).

While Delchester's argument relies upon a correct statement of the law regarding how a reviewing court must interpret a zoning ordinance, Delchester erroneously asserts that the principles of statutory construction are determinative of the issue before us. The Township does not dispute that the term "site" as used in the ZO is necessarily broader than the definition provided for the term "lot." Rather, the ZHB and the Trial Court concluded that there was substantial evidence in the record to demonstrate that Delchester's Plan did not merge the two lots into one "site." (ZHB Decision, F.F. ¶¶83-87; Trial Court Op. at 19-20.) Therefore, while the two terms may have different meanings when applied to a "site" consisting of multiple lots, the terms become synonymous in the instant matter by virtue of the fact that each "site" Delchester seeks to develop consists of a single "lot." As a result, the Trial Court did not err in concluding that Delchester's

development of the CI lot must not exceed the impervious surface coverage limitations applicable to sites within the Groundwater Protection District.

## VI.

Delchester's final argument on appeal concerns whether the Trial Court erred in concluding that the access point Delchester seeks to construct on the Industrial Lot to allow vehicles to travel onto the Industrial lot from Old Baltimore Pike and across the Industrial lot to the CI lot is an "internal access drive" rather than a "driveway." The Township contends that the access point Delchester is seeking serves multiple buildings and the parking lot on the CI lot, and therefore clearly fits within the definition of an "internal access drive" rather than a "driveway."[17]

Under the ZO, the term "driveway" is defined as "a private cartway providing vehicle access from such property to and from a public or private street, designed in accordance with the Township's [SALDO]." (ZO § 27-202.) The term "driveway, internal access" is defined in the ZO as "a private driveway within a tract of land and designed to serve multiple units or buildings, linking parking lots and individual driveways to adjacent streets." (ZO § 27-202.) A special exception may be granted to permit an "internal access drive" to be located within

---

[17] The Trial Court concluded that Delchester had waived its argument that the access point is both a "driveway" and an "internal access drive." (Trial Court Op. at 18.) In addition, the Trial Court concluded that even if the argument had not been waived, by advancing the theory that the access point was both an "internal access drive" and a "driveway," Delchester consequently admitted that the access point was an "internal access drive." (*Id*.) Finally, the Trial Court concluded that Delchester was attempting to re-litigate an issue that had been decided in the ZHB's 2008 decision denying Delchester a special exception to locate an "internal access drive" on the Industrial lot. (*Id*.) With regard to the waiver issue, we conclude that Delchester's argument regarding the dual nature of the access point was sufficiently presented before the ZHB and is therefore cognizant on appeal. In regards to Delchester's contention that any reliance on the ZHB's 2008 decision is improper, we disagree, as it was clearly made a part of the record below by Delchester, which submitted the decision as Exhibit A7 before the ZHB. (ZHB Decision, F.F. ¶¶80-81.)

the 100-foot sideyard setback from the Industrial Lot boundary line, as long as it is reduced by no more than 25 feet. (ZO § 27-1303(2)(B).) An entrance or exit "driveway" is permitted within the setback. (*Id.*) The access point proposed by Delchester is within 8 feet of the boundary line; if is a "driveway" then it is permitted within the setback, if it is a "driveway, internal access" then it is not permitted within the setback.

The ordinance is not ambiguous. An internal access drive is a specific type of driveway subject to a greater perimeter setback than an entrance or exit driveway. The access point proposed by Delchester is a driveway but, as admitted by Delchester, the access point falls within the more specific definition of a "driveway, internal access," because it is designed to serve multiple units or buildings, linking parking lots and individual driveways to adjacent streets, and is not limited to providing access to and from a public street. Therefore, the additional access point proposed by Delchester to link the Industrial lot's frontage on Old Baltimore Pike to the buildings and parking located on the CI lot is subject to the more restrictive setback applicable to a "driveway, internal access."

Furthermore, even if we concluded that the access point was a "driveway" and not subject to the less restrictive setback, Delcehster would still not be entitled to zoning relief. The ZHB found, as it did in its 2008 decision, that the access point proposed by Delchester on the Industrial lot would impede the flow of traffic and lead to a stacking problem adversely impacting the public health, safety and welfare. (ZHB Decision F.F. ¶¶80-81, Discussion at 13-14.) This finding was supported by expert testimony from the Township Engineer found credible by the ZHB. (*Id.*) Notably, the ZHB also found that the only difference between Delchester's previous proposal to construct an internal access

drive and the current proposal is that the newly located internal access drive would exacerbate the stacking issue by reducing the distance between the CI lot access point to Old Baltimore Pike and the proposed internal access drive. (*Id*.) Delchester has not challenged the ZHB's finding that the additional access point on the Industrial lot would have a detrimental effect on the public welfare and therefore it is not only binding on appeal, but determinative of Delchester's challenge to the ZHB's denial of zoning relief. *See, e.g. O'Hara's Appeal*, 131 A.2d 587, 596 (Pa. 1957); *In re Jones*, 29 A.3d 60, 65 (Pa. Cmwlth. 2011).

In sum, we hold that: (i) the Trial Court did not err in concluding that the ZHB lacked jurisdiction to decide Delchester's substantive validity challenge to the Township's SWMO because the SWMO is not a land use ordinance; (ii) the Trial Court did not err in concluding that the "net out" provision in the Township's ZO is valid because the provision is substantially related to the Township's power to protect the public health, safety, and welfare, and the provision has the required nexus to the Township's legitimate interest in mitigating the impact of stormwater on the public and, at minimum, bears a rough proportionality to the impact of Delchester's proposed development on that interest; (iii) the Trial Court did not err in concluding that the word "site" as used in the ZO is synonymous with the word "lot" as that term is defined in the ZO when applied to Delchester's proposed development; and (iv) the Trial Court did not err in its conclusion that the proposed driveway is a "driveway, internal access" as that term is defined in the ZO.

_____
**JAMES GARDNER COLINS, Senior Judge**

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Delchester Developers, L.P., : 
          Appellant : 
           : 
       v. : No. 86 C.D. 2016 and 87 C.D. 2016
           : 
Zoning Hearing Board of the : 
Township of London Grove and : 
London Grove Township and : 
Dominic DiFilippo, Ricco DiFilippo, : 
and Lynn Soliwoda-DiFilippo : 

## O R D E R

AND NOW this 9th day of May, 2017, the December 18, 2015 order and the January 4, 2016 amended order of the Court of Common Pleas of Chester County affirming the June 27, 2014 decision and order of the London Grove Township Zoning Hearing Board in the above-captioned matter are AFFIRMED.

                                    _____

                                    **JAMES GARDNER COLINS, Senior Judge**