IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Eric Rylka and Christina Rylka, : 
                Appellants : 
                 : 
            v. :    No. 1243 C.D. 2024
                 : 
Zoning Hearing Board of Hamilton :    Submitted: December 8, 2025
Township and Hamilton Township : 

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE STACY WALLACE, Judge
             HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION
BY JUDGE McCULLOUGH               FILED: January 27, 2026

Eric Rylka and Christina Rylka (Landowners) appeal from the order entered by the Court of Common Pleas of Monroe County (trial court) on July 23, 2024. By that order, the trial court denied Landowners' appeal from the December 6, 2022 decision and order of the Zoning Hearing Board of Hamilton Township (ZHB), which denied Landowners' appeal from an enforcement notice issued by Hamilton Township's (Township, together with the ZHB, Appellees) zoning officer on February 9, 2022. Therein, the zoning officer cited Landowners with, among other violations, operating a multi-family use on their property, which is located in a zoning district where such uses are not permitted.

In this Court, Landowners seek reversal of the trial court's order, contending that they are entitled to continue the multi-family use on their property pursuant to vested rights, variance by estoppel, and equitable estoppel theories. They also challenge the trial court's order entered November 2, 2023, denying their motion for a hearing to supplement the record from the ZHB (Hearing Motion).

After careful review, we affirm.

# I.   BACKGROUND AND PROCEDURAL HISTORY

The pertinent facts, as found by the ZHB after several days of hearings, may be summarized as follows.[1]  Landowners purchased the Property, a 13-acre parcel in the Township, in 2018 from Mark H. and Nancy H. Brown.  At the time of purchase, the Property was improved with three structures: (1) a single-family dwelling; (2) a detached garage (Garage) with two second-story apartment units (Apartments 1 and 2); and (3) a detached building known throughout these proceedings as the "barn" (Barn), which housed two additional, unfinished apartment units (Apartments 3  and 4).  (ZHB Findings of Fact (FOF) 7; Reproduced Record (R.R.) at 231.)[2]

Mark H. Brown, one of the former owners, testified before the ZHB that, at the time the Garage and Apartments 1 and 2 were completed in 2000 and 2001, then-Township Zoning Officer Jacqui Colabaugh (Colabaugh) came to the Property to inspect them.  At that time, Mr. Brown advised Colabaugh that Apartments 1 and 2 probably would be utilized by the Browns' two teenage sons, who eventually resided, to some degree, in the Apartments for six or seven years.  (R.R. at 85-86, 96.)  Thereafter, the Browns' two other sons resided in Apartments 1 and 2 for various periods of time.  After the last of the four sons moved off of the Property, the Browns

---

[1] Where supplementation of the ZHB's findings has been necessary to our analysis, we include pertinent citations to the Reproduced Record.

[2] Landowners' Reproduced Record does not comply with Pennsylvania Rule of Appellate Procedure 2173, which requires that the Reproduced Record be numbered with Arabic numerals followed by a lowercase "a."  We nevertheless refer herein to pages of the Reproduced Record as they have been numbered by Landowners.

leased Apartments 1 and 2 to third parties. (FOF 11-12.) At that point, Apartments 1 and 2 each had a labeled mailbox. (R.R. at 90.)[3]

Prior to its construction, the Browns obtained a construction permit for the Barn, which was substantially completed in 2012 and had rolling garage doors and two floors. The first floor had a kitchen and bathroom, and the upstairs had finished walls and two bathrooms. *Id.* at 92. The Barn was inspected by a Township representative, at which time the Barn contained plumbing and electric service. *Id.* at 93. Although they substantially completed construction of the Barn, the Browns did not finish or rent Apartments 3 or 4 prior to selling the Property.

The Agreement of Sale between the Browns and Landowners contained multiple provisions authorizing Landowners to inspect the Property, but it contained no representations that the Property complied with local zoning regulations,[4] had been issued necessary utility or occupancy permits for a multi-family use, or was outfitted with adequate water or sewage lines for such a use. (FOF 1, 5-6; R.R. at 198-207; 230-31.) The real estate listing for the Property contained the following description under the "Remarks" section:

> Exceptional opportunity to own this Victorian Era [f]armhouse farmette! Expanded through the years to accommodate a growing family, this home offers beautifully finished bedrooms and baths. . . . Be impressed with the extra[-] large in[-]law suite over the garage! . . . . Five

---

[3] At some point prior to or during its construction, Mr. Brown had conversations concerning the Garage with then-Supervisor of the Township, Alan Everett, at the Township offices. Mr. Brown did not remember the precise contents or timing of those conversations and thought they could have been about another barn not involved to these proceedings. (R.R. at 99-100.)

[4] The Agreement of Sale did contain a representation from the Browns that they had not *received any notices* of violation of laws, ordinances, regulations, orders, or other legal requirements concerning the Property. (Agreement of Sale, ¶ 10; R.R. at 201.)

3

[-]car detached garage has 2 apts above with solid leases, good rents. Impressive finished barn offers open concept first floor with extra large modern kitchen, great for entertaining or living quarters! Second floor offers 3 baths w/multiple shower and commode stalls and four bedrooms waiting for finishing touches. 2 stocked ponds, [P]roperty is bordered by a babbling brook, all on over 13 pristine acres . . . .

(R.R. at 146, 212-13.) Under the "Agent Rmks" section of the listing, the real estate agent stated:

[]Both apartments are occupied. The one bedroom is $625/mo and the two[-]bedroom is $825/mo., both have leases and security deposits.

*Id.* at 146, 213.

The Seller's Property Disclosure Statement (Seller's Disclosure) indicated that permits for construction of the Garage and the Barn were obtained and that inspections of those buildings were performed "as required." No permits were introduced into the record before the ZHB, and nothing in the Seller's Disclosure indicated that occupancy or residential use permits were obtained for Apartments 1 and 2. The disclosure statement also represented that they were not aware of any violations of federal, state, or local laws or regulations. (FOF 8-10; R.R. at 134, 141.)

Prior to closing, Landowners did not personally conduct any due diligence as to the zoning requirements applicable to the Property or whether the Browns had, in fact, obtained all necessary permits for the structures and multi-family uses on the Property. (FOF 18.) Landowners instead engaged Joseph Hanyon, Esquire, who is a member of the law firm MHK Attorneys, LLP. MHK Attorneys, LLP has an address identical to that of Penn Realty Settlement Services, the settlement agent identified on

4

the Department of Housing and Urban Development (HUD) Settlement Statement. Landowners believed that Attorney Hanyon would perform all services required for the purchase of the Property, including checking for zoning compliance. Landowners did not, however, introduce into the record any documents showing the scope of Attorney Hanyon's engagement, and the HUD Settlement Statement indicates only that Attorney Hanyon prepared documents and conducted document review. It makes no mention of additional components of the representation, including any investigation into the Property's compliance with local zoning laws. (FOF 27-29; R.R. at 208-09, 216-18.)

At the time of the purchase, Apartments 1 and 2 were occupied by paying tenants, whose leases transferred to Landowners at closing. Attorney Hanyon apportioned the rents from Apartments 1 and 2, arranged for the transfer of the security deposits, and oversaw the assignment of the leases from the Browns to Landowners. (R.R. at 115.) As of the date of sale, Apartments 3 and 4 were incomplete and required additional plumbing and electrical work as well as flooring and kitchen cabinet installation. The Barn was, however, insulated, drywalled, painted, and trimmed, and had electrical and plumbing service. Landowners completed this work after the purchase and commenced leasing Apartments 3 and 4 to third parties in 2019. Landowners did not obtain any permits or approvals for the construction work performed on Apartments 3 and 4 or to lease them to third parties. (FOF 13-15, 22-25; R.R. at 88, 216, 220.) Mr. Rylka testified that Landowners purchased the Property assuming that the rental income from the Apartments would continue. He indicated that they could not afford the mortgage on the Property without the rental income. (R.R. at 114.)

During Landowners' early ownership of the Property, a serious sewage malfunction caused raw sewage from the Apartments to back up into Landowners'

5

residence. At the time, all of the sewage lines from the Apartments ran directly to the residence, from which they then ran with the residence's line to a common septic field. In response, Landowners re-routed the sewage lines from the Apartments directly to the septic field but did not apply for or obtain any permits for the repair work. (FOF at 16-17; R.R. at 221-22.) As to fresh water, the residence and all four apartments on the Property are serviced by a common well. (FOF 21.)

Sometime after Landowners purchased the Property, but before the leasing of Apartments 3 and 4 had commenced, then-Township zoning officer Robert Rehman visited the Property on multiple occasions. Mr. Rehman had developed a friendly relationship with Landowners and had stopped at the Property to talk about various topics, including projects on other properties in the Township. On one occasion, Mr. Rehman came to the Property to post a permit obtained by Landowners to replace a roof on the Property. At the time, Apartments 3 and 4 were not completed, and Mr. Rehman did not inspect the Property. Landowners nevertheless believed that the leased apartments on the Property were obvious, in part because of the presence of multiple mailboxes on the Property and its visibility from public roads. (R.R. at 121-23.)

In early 2018, a neighboring property owner advised the Township that people appeared to be living in detached buildings on the Property. (R.R. at 22.) Based on the report, Township Zoning Officer Shawn McGlynn (Zoning Officer McGlynn) went to the Property to investigate. Upon observing the Property from the road, Zoning Officer McGlynn noticed that the accessory buildings had multiple electric meters, a second-story deck with sliding doors, and dormers and double-hung windows, all of which indicated that people were living in the Garage and Barn. He also saw what appeared to be a parking lot for tenants. (R.R. at 11-16.)

6

On February 9, 2022, Zoning Officer McGlynn issued to Landowners an enforcement notice (Enforcement Notice), citing them with (1) establishing a multi-family residential use on the Property without first obtaining a zoning permit in violation of Section 902.1 of the Hamilton Township Zoning Ordinance (Ordinance);[5] (2) establishing a multi-family residential use on the Property, which is not a permitted use in the "A" Zoning District; (3) the use and occupancy of multi-family residential units without obtaining a Certificate of Use and Occupancy in violation of Section 902.5 of the Ordinance;[6] and (4) the use and occupancy of multi-family residential units without demonstrating septic capacity and water supply in violation of Section 103 of the Ordinance.[7] (FOF 2-3; R.R. at 230.)

Landowners did not deny that both the Garage and Barn contained the Apartments. Landowners nevertheless appealed the Enforcement Notice to the ZHB, which held hearings on June 7, 2022, September 20, 2022, and October 11, 2022.[8] In their appeal, Landowners did not dispute the lack of permitting or the fact that the multi-family uses on the Property are not permitted in the "A" Zoning District. Instead, they asserted their entitlement to continue the multi-family use on the Property based on the theories of vested rights, variance by estoppel, and/or equitable estoppel.

---

[5] Hamilton Township, Pa., Hamilton Township Zoning Ordinance (1985). Section 902.1 of the Ordinance governs zoning permits and precludes a change in use of land without first obtaining a zoning permit from the Township. (R.R. at 281.)

[6] Section 902.5 of the Ordinance governs certificates of occupancy and requires the issuance of a certificate by the Zoning Officer upon "completion of the erection, modification, expansion, enlargement, alteration or conversion of any structure building or part thereof . . . ." (R.R. at 283.)

[7] Section 103 of the Ordinance provides, in pertinent part, that it was established "to promote the public health, safety, morality, and the general welfare . . . ." (R.R. at 284.)

[8] No objectors or other members of the public appeared at the hearings either in support of or against Landowners' appeal.

The ZHB issued its decision and order on February 9, 2022, therein making findings of fact and conclusions of law. After first concluding that the Township established a *prima face* case of the violations cited in the Enforcement Notice, the ZHB rejected all of Landowners' equitable theories, concluding as follows:

> 30. Based upon the lack of specific evidence of the scope of [Attorney] Hanyon's services and/or the services of Penn Realty Settlement Services or MHK Attorneys, LLP and Mr. Rylka's candid testimony that he did not personally review the Ordinance or make inquiry to the Township with respect to the zoning of the Property, the [ZHB] finds that [Landowners] did not proceed in good faith [to] be exercising appropriate due diligence before purchasing the Property by making appropriate due diligence inquiries of the Township and investigations of the Ordinance with respect to the zoning regulations applicable to the Property. The [ZHB] finds that the [Landowners] did not sustain their burden of proof to establish a [v]ariance by [e]stoppel or a [v]ested right or any elements of [e]quitable [e]stoppel.
>
> 31. There was minimal evidence that the Township ever was aware that the detached [G]arage and [B]arn were improved with four apartments and were being used and leased to non-family[-]member third parties. In fact, Mr. Brown testified that he informed Township [Zoning Officer] [Jacqui] Colabaugh that the two apartments over the [Garage] were being used as rooms for Mr. Brown's children. Mr. Brown did not testify that he informed any Township official that Apartments 1 and 2 were being leased to non-family members or that Mr. Brown applied for and was issued a permit by the Township for such use.
>
> 32. [Landowners] have failed to prove their entitlement to a vested right, variance by estoppel, or equitable relief . . . .
>
> 33. [Landowners] have not proved the requirement that they proceeded in good faith with appropriate due diligence to determine whether the existing or intended multi[-]family uses of the Property comply with the provisions of the Ordinance.

8

34. The serious sewage system malfunction suffered by [Landowners] created a serious unsanitary condition by flooding [Landowners'] home with raw sewage[,] which could have adversely affected not only [Landowners] but also the public health, safety, and welfare.

35. Since no permits or approvals of any type were introduced into the record, such as sewage, zoning, and occupancy permits, the only "evidence" that permits were issued is the information disclosed in the Seller's [] Disclosure [] . . . [,] which states that all permits were obtained by Mr. and Mrs. Brown and that Mr. and Mrs. Brown were not aware of any violations of any federal, state or local laws . . . or [any] existing or threatened legal action affecting the Property. These "representations" were made to [Landowners] as purchasers[,] but [Landowners] did not include those representations in the formal purchase agreement nor did [Landowners] verify whether these representations were true or correct. Therefore, the [ZHB] finds and concludes that [Landowners] did not proceed with the good faith required by all of the equitable doctrines asserted by [Landowners].

36. [Landowners] have failed to sustain their burden of proof and have failed to overcome the violations of the Ordinance alleged by [ ] Zoning Officer [McGlynn] in the Enforcement Notice.

(ZHB Decision, Findings/Conclusions 30-36; R.R. at 236-37.)

Landowners appealed to the trial court, where they filed the Hearing Motion pursuant to Section 1005-A of the Municipalities Planning Code (MPC).[9] (R.R. at 244.) Landowners therein sought to supplement the record from the ZHB chiefly to include additional evidence regarding their purchase of the Property and their relationship with Attorney Hanyon. The trial court denied the Hearing Motion by order entered November 2, 2023, and proceeded to decide Landowners' appeal on the record

_____

[9] Act of July 31, 1968, P.L. 805, *as amended*, added by the act of December 21, 1988, P.L. 1329, 53 P.S. § 11005-A.

9

as certified from the ZHB. The trial court ultimately affirmed, concluding that Landowners had not established their entitlement to continue the multi-family use on the Property under any of the theories of vested rights, variance by estoppel, or equitable estoppel.

As to vested rights, the trial court concluded that Landowners failed to establish that a permit authorizing a multi-family use was issued erroneously or at all. As to variance by estoppel, the trial court concluded that Landowners failed to establish that the Township had actively acquiesced in the multi-family use of the Property, that Landowners had proceeded in good faith, that Landowners had made substantial expenditures to improve the Property in reliance on the multi-family use, or that any unnecessary hardship would be caused by strict compliance with the Ordinance. (R.R. at 260-66.) Lastly, as to equitable estoppel, the trial court concluded that Landowners failed to establish that the Township made a misrepresentation to Landowners indicating that a multi-family use was permitted. *Id.* at 267.

Landowners now appeal to this Court.

## II. ISSUES

Landowners present two overarching issues in this Court, the first of which contains multiple subparts. Landowners first argue that the trial court erred in affirming the ZHB because they established their right to continue the multi-family use on the Property on grounds of vested rights, variance by estoppel, and/or equitable estoppel. Landowners argue secondly that the trial court abused its discretion in denying the Hearing Motion.

10

## III.  DISCUSSION

### A.  The Hearing Motion

We first address Landowners' second issue regarding the Hearing Motion. Section 1005-A of the MPC provides, in pertinent part:

> If, upon motion, it is shown that proper consideration of the land use appeal requires the presentation of additional evidence, a judge of the court may hold a hearing to receive additional evidence, may remand the case to the body, agency or officer whose decision or order has been brought up for review, or may refer the case to a referee to receive additional evidence . . . . If the record does not include findings of fact or if additional evidence is taken by the court or by a referee, the court shall make its own findings of fact based on the record below as supplemented by the additional evidence, if any.

53 P.S. § 11005-A.  A trial court has broad discretion in this respect:

> It is a matter within the discretion of the trial court to determine whether supplementation of the record is appropriate under this statute.  Only where the party seeking the hearing demonstrates that the record is incomplete **because the party was denied an opportunity to be heard fully, or because relevant testimony was offered and excluded is a court compelled to open the record.** Therefore, where the court finds that the record was sufficient to effectively review and address the appeal, it is not required to hear additional evidence.

*Piper Group, Inc. v. Bedminster Township Board of Supervisors,* 992 A.2d 224 (Pa. Cmwlth. 2010) (internal citations and quotations omitted) (emphasis provided). Moreover, where a party seeks to introduce additional evidence in the trial court that was available at the time of the hearing before the ZHB, the trial court may refuse the evidence.  *Morris v. South Coventry Township Board of Supervisors*, 898 A.2d 1213, 1217-18 (Pa. Cmwlth. 2006) (objector did not "have the right to constantly seek to

introduce new evidence either to overcome deficiencies in her original presentation of the case" or to "have the additional documents or testimony lead to a different result").

Landowners requested that the trial court re-open the record so that they could present additional evidence regarding their purchase of the Property, the Seller's Disclosure, and the role that putative rental income played in Landowners' decision to purchase the Property. (Trial Ct. Op., 11/2/23, at 4 (unpaginated).) The trial court, after reciting the correct standard of review, denied the motion, concluding that Landowners did not establish any valid grounds justifying the trial court's reception of additional evidence. The trial court reasoned as follows:

> [Landowners] do not assert in their motion or brief that the record was incomplete because they were denied the opportunity to be heard, or because testimony or evidence, claimed to be relevant, was offered but excluded by the [ZHB]. . . . [Without] these assertions, [the trial c]ourt is not persuaded to accept the further evidence [Landowners] seek to introduce . . . . Indeed, the record indicates the [ZHB] held four separate hearings during which, upon a careful review of the certified record, [Landowners] were afforded the full opportunity to provide evidence and testimony on the matters that they now assert. Additionally, [Landowners] have not claimed any relevant evidence was excluded by the [ZHB].
>
> Moreover, [Landowners] in their brief assert the [ZHB] in rendering its decision miscomprehended or was confused by certain evidence presented to it. However, determinations as to the credibility of witnesses and the weight to be given to evidence are matters left solely to the [ZHB] in the performance of its factfinding role. Also, we are not inclined to allow the record to be opened for [Landowners] to introduce new evidence either to seek to overcome deficiencies that may have existed in their original presentation of the appeal to the [ZHB] or to somehow have additional documents or testimony lead to a different result.

(Trial Ct. Op., 11/2/23, at 5 (unpaginated).)

We discern no abuse of discretion in the trial court's reasoning or ruling. Landowners argued in the Hearing Motion that supplementation of the record was necessary to "clarify" certain issues regarding their relationship with Attorney Hanyon, the financial aspects of their purchase of the Property, and the Seller's Disclosure Statement. Landowners insisted that the ZHB was confused on these issues and incorrectly interpreted the Seller's Disclosure. (Original Record (O.R.) Document (Doc.) No. 25, at 3-4, 7-8.) Nowhere did Landowners argue that the ZHB excluded relevant evidence or that they were otherwise denied the opportunity to present their case. Instead, Landowners simply desired another opportunity to present evidence, which was already in their possession during the multi-day hearing before the ZHB, because they disagree with the ZHB's findings and analysis. Those are insufficient grounds to re-open the record, and the trial court appropriately exercised its discretion under Section 1005-A to keep it closed. We accordingly affirm its order denying the Hearing Motion.

## B.    **Merits**[10]

On the merits, Landowners argue that the ZHB erred in refusing to recognize their right to continue the multi-family use on the Property on the theories of vested rights, variance by estoppel, and/or equitable estoppel.[11]

---

[10] Where the trial court does not receive additional evidence, our review is limited to determining whether the ZHB erred in law or manifestly abused its discretion. The ZHB abuses its discretion only where it makes findings unsupported by substantial evidence in the record, which is relevant evidence that a reasonable mind might find adequate to support a conclusion. *Delchester Developers, L.P. v. Zoning Hearing Board of Township of London Grove*, 161 A.3d 1081, 1085 n.1 (Pa. Cmwlth. 2017).

[11] Regrettably, the argument section of Landowners' brief does not separate by headings or any other designations the applicable law and analysis for each theory of vested rights, variance by estoppel, and equitable estoppel. We therefore have been left to sort through Landowners' arguments **(Footnote continued on next page…)**

13

To begin, we note that the theories of vested rights, variance by estoppel, and equitable estoppel are

> three labels assigned in Pennsylvania land use/zoning law to the equitable remedy precluding municipal enforcement of a land use regulation. Our courts have generally labeled the theory under which a municipality is estopped: (1) a "vested right" where the municipality has taken some affirmative action such as the issuance of a permit[]; a "variance by estoppel" where there has been municipal inaction amounting to active acquiescence in an illegal use[]; or, "equitable estoppel" where the municipality intentionally or negligently misrepresented its position with reason to know that the landowner would rely upon the misrepresentation[.] Estoppel under these theories is an unusual remedy granted only in extraordinary circumstances and the landowner bears the burden of proving his entitlement to relief. Except for the characterization of the municipal act that induces reliance, all three theories share common elements of good faith action on the part of the landowner: [(]1) that he relies to his detriment, such as making substantial expenditures,[(] 2) based upon an innocent belief that the use is permitted, and [(]3) that enforcement of the ordinance would result in hardship, ordinarily that the value of the expenditures would be lost.

*In re: Kreider*, 808 A.2d 340, 343 (Pa. Cmwlth. 2002) (citations omitted).[12]

### 1.   Vested Rights

A property owner may acquire certain vested rights in property where a municipality erroneously has issued the owner a permit. *See Petrosky v. Zoning Hearing Board of Upper Chichester Township*, 402 A.2d 1385, 1388 (Pa. 1979).

---

and the cases they cite to discern which law and analysis applies to each of the elements for the various theories. *See* Pa.R.A.P. 2119(a).

[12] As to the analytical distinctions among the three theories of equitable relief, we explained in *In re Kreider* that "the different labels impose an analytical rigidity that is not helpful. Municipal action that may underpin estoppel often embodies more than one category[.]" 808 A.2d at 343 n. 5.

Although other factors are considered in determining whether such rights have vested, the issuance of a permit is essential to the claim. *Muth v. Ridgeway Township Municipal Authority*, 8 A.3d 1022, 1026 (Pa. Cmwlth. 2010); *see also Chateau Woods, Inc. v. Lower Paxton Township*, 772 A.2d 122, 126 (Pa. Cmwlth. 2001) ("The vested rights doctrine permits a landowner to use his property without obtaining a variance. However, the doctrine only applies to those cases where the applicant, in good faith, relies upon a permit issued in error and incurs significant non-recoverable costs.") (citation omitted).

Although Landowners' arguments in this respect are difficult to follow, it appears that Landowners contend, based on the Seller's Disclosure and Zoning Officer McGlynn's testimony, that certain permits were issued for the *construction*, but not occupancy or residential use, of the Garage and Barn. Landowners then argue that, because those permits did not include authorizations for residential use, they were issued in error but were then "validated" by Zoning Officer Jacqui Colabaugh's inspection and approval. (Landowners' Br. at 20-21.). These arguments fail for at least two reasons.

First, Landowners concede that no permits were ever issued, prior to or after their purchase of the Property, authorizing a multi-family use. Although the Seller's Disclosure represents generically that *construction* permits and inspections were issued and conducted for the Garage and Barn in 2000 and 2012, respectively, it is clear that those permits and inspections had nothing to do with authorizing the rental of Apartments 1 and 2 over the Garage or the construction and rental of Apartments 3 and 4 in the Barn. *See* R.R. at 28-29. Rather, the permits that were issued were for a "garage/workshop with storage" and an "agricultural barn." (R.R. at 31.)

Second, at the time Zoning Officer Jacqui Colabaugh inspected the garage in either 2000 or 2001, it is undisputed that the space above the Garage was to be occupied by the Browns' teenage sons, who lived there for several years. (R.R. at 84-87.) Mr. Brown testified that he told Colabaugh that his sons "probably" would be living there. *Id.* at 86. There is no evidence indicating that Mr. Brown ever told Colabaugh that the space above the Garage would be utilized as two apartments leased for rent to third parties. Indeed, it was not until many years later that paying tenants moved into that space, and it is undisputed that no permits for the leasing of those Apartments (or Apartments 3 and 4 in the Barn) were ever issued. Thus, Colabaugh's inspection in no way "validated" a multi-family use of the Property.

Given that the theory of vested rights requires the issuance of a permit authorizing the desired use, the absence of such permits here is fatal to Landowners' vested rights claim. The trial court therefore did not err in affirming the ZHB's rejection of this theory.

## 2. Variance By Estoppel

Although not designated as such, Landowners' variance by estoppel argument appears to be at the center of their appeal. We recently summarized the well-established requirements for a variance by estoppel:

> [A] variance by estoppel is an unusual remedy under the law and is granted only in the most extraordinary circumstances. . . . [The factors to be considered are:]
>
> > 1. A long period of municipal failure to enforce the law, when the municipality knew or should have known of the violation, in conjunction with some form of active acquiescence in the illegal use. However, a mere showing that a municipality has failed to enforce the law for a long period of time is insufficient in itself to support the grant of a variance. . . .

2. Whether the landowner acted in good faith and relied innocently upon the validity of the use throughout the proceedings. But in assessing whether a landowner's reliance upon municipal inaction is reasonable, a landowner is duty bound to check the property's zoning status . . . .

3. Whether the landowner has made substantial expenditures in reliance upon his belief that his use was permitted.

4. Whether the denial of the variance would impose an unnecessary hardship on the applicant, such as the cost to demolish an existing building.

[The] mere passage of time does not, in itself, entitle a property owner to a variance by estoppel. In those cases where we have granted a variance by estoppel, the municipalities have done more than passively stand by; they have committed some affirmative act, such as granting a building permit, which would reasonably lead a property owner to conclude that the proposed use was sanctioned under the law. . . .

*In re: Wagner*, 339 A.3d 582, 592-93 (Pa. Cmwlth. 2025) (quoting *Skarvelis v. Zoning Hearing Board of Borough of Delmont*, 679 A.2d 278, 281-82 (Pa. Cmwlth. 1996)) (internal citations omitted). "[T]o prevail under the theory of variance by estoppel, [applicants] must establish all of the essential factors by clear, precise[,] and unequivocal evidence." *Id.* at 593 (citation, quotations, and emphasis omitted).

### a. Failure to Enforce/Active Acquiescence

As to the first factor, both the ZHB and trial court concluded that Landowners did not establish that the Township took any affirmative acts to lead either the Browns or Landowners to believe that a multi-family use was lawful. We agree and discern no error. Landowners contend that the Township knew or should have known of the multi-family use on the Property because (1) physical aspects of the Property that were visible to the public did or should have indicated to the Township

17

that the Property was, or was intended to be, used for multi-family purposes; and (2) conversations that Landowners and/or the Browns had with Township representatives should have made the multi-family use obvious. We disagree.

At most, Landowners established that the Township had or could have had some awareness that the Browns constructed the Garage and Barn with the intent to either house family members, host events, or both.[13] As to the Garage, Mr. Brown testified that he told Colabaugh that his teenage sons probably would live in the space above it, which they and their brothers after them did for many years. Other than perhaps the installation of mailboxes at or on the Garage, nothing about the Garage changed that would have notified the Township that the Browns (and then Landowners) converted the second-floor Garage space to income-producing apartments leased to third parties.

As to the Barn, it was not finally accommodated to house tenants until after Landowners purchased the Property. Although Mr. Rylka testified that Mr. Rehman was on the Property to issue a permit for an unrelated roof project, the mere possibility that Rehman saw or became aware of any of the tenants is not established in the record and, at most, is speculation.[14] Landowners simply have not established in the record any long period of acquiescence on the part of the Township during which it knew or should have known of the multi-family use on the Property. The speculative

---

[13] Mr. Brown testified that, when the Browns first constructed the Barn, they intended to have meetings on the first floor and perhaps host a children's summer camp. (R.R. at 91-92.)

[14] Landowners assert that, when Mr. Rehman visited the Property, the mailboxes for Apartments 1 and 2 were visible and the Barn contained unfinished living space that should have alerted Rehman that it would be used for residential purposes. Landowners contend that, "[b]y not revoking the permit[,] [Rehman] acquiesced to its use." (Landowners' Br. at 26.) The Township's failure to "revoke" a building permit does not constitute an affirmative act that would lead any reasonable person to believe that the Township acquiesced in the Barn's *future* residential use.

18

knowledge that Landowners suggest the Township had or should have had from conversations with Colabaugh, Rehman, and Everett, and the fact that certain aspects of the exterior of the Garage and Barn were visible from a public road, are not sufficient. Landowners similarly have failed to establish any affirmative act on the *part of the Township* during the relevant period that would have led either the Browns or Landowners to believe that the Township permitted multi-family uses on the Property. *See Skarvelis*, 679 A.2d at 282 (even where municipality had notice of zoning violations for seven years, it nevertheless took no affirmative actions that would constitute "active acquiescence," which defeated variance by estoppel theory).

To save their argument, Landowners appear to rely on the definition of "Family" in the Ordinance to argue that the residence of the Browns' teenage sons in the space above the Garage converted the Property into a "multi-family" use. "Family" is defined in the Ordinance as "[o]ne or more persons, occupying a dwelling unit, related by blood, marriage, or adoption, living together as a single housekeeping unit and using cooking facilities and certain rooms in common." (O.R. Doc. No. 13, Part 6, at Z-8.) Relatedly, "dwelling unit" is defined as follows:

> A building or portion thereof consisting of one (1) or more rooms arranged for living purposes together with separate cooking and sanitary facilities used or intended to be used by one (1) or more individuals living together and maintaining a common household, and accessible from the outdoors either directly or through an entrance hall shared with other dwelling units.

*Id.* Landowners contend that the Browns' teenage sons, while residing above the Garage, were not occupying the same "dwelling unit" as their parents, would not be using the same cooking facilities or other rooms in common with them, and therefore constituted a separate "family" for zoning purposes. (Landowners' Br. at 24-25.)

19

Landowners accordingly contend that a multi-family use of the Property was or should have been obvious to Colabaugh when she initially inspected the Garage. We disagree.

First, Landowners' argument in this respect is based on a strained reading of the definitions of "family" and "dwelling unit." To be a "family," one or more individuals must occupy a single dwelling unit, be related by blood or otherwise, live together as a single housekeeping unit, and use common cooking facilities and other common rooms. A dwelling unit, in turn, may be a building *or any portion thereof* in which one or more individuals live together and maintain a common household and that has separate cooking and sanitary facilities and outside access. Nothing in these definitions requires that a family's "dwelling unit" be confined to only a single structure; it could instead be composed of portions of several buildings. Here, the fact that the Browns' teenage sons spent undetermined amounts of their time in the space above the Garage does not necessarily remove them from their parents' dwelling unit or family under the definitions of those terms in the Ordinance.

More importantly, however, nothing in the record establishes how much time the sons spent in the Garage, whether they ever cooked there, or whether they ever established *between themselves* a common household or single housekeeping unit that could itself constitute a "family" or "dwelling unit." At the time Colabaugh inspected the Garage, no one lived in it. Mr. Brown told Colabaugh that his two teenage sons *probably were going* to reside there, but did not give any detail as to what that meant. More basically, a common sense interpretation of the Ordinance would militate against any conclusion that two teenage boys who potentially only slept in garage apartments

20

on the same property as their family home thereby established between themselves a new "family" and "dwelling unit" that converts a property into a multi-family use.[15]

For these reasons, the ZHB's finding that Landowners did not establish a longstanding and active acquiescence by the Township in the multi-family use on the Property is supported by substantial evidence in the record. The trial court accordingly did not err in affirming the ZHB's decision in this regard.

b.     Good Faith and Innocent Reliance

Although Landowners concede that they personally performed no investigation prior to purchasing the Property to determine whether it was zoning compliant, they contend that they proceeded in good faith reliance on (1) representations made by the Browns in the Seller's Disclosure that certain permits were issued and that the Browns were unaware of any violations of federal, state, or local laws; and (2) the involvement of Attorney Hanyon in the transaction, who they believed would "handle everything related to the purchasing of the [P]roperty," including an investigation as to whether it was compliant with local zoning laws and regulations. (Landowners' Br. at 21-22.) Landowners contend that these representations establish their good faith belief that the Property was compliant with the Ordinance when they purchased it. *Id.* at 21-24. We again disagree.

Landowners admit that they performed no investigation or reconnaissance at all as to whether the Property as sold was in violation of any local zoning laws. They relied entirely on the representations in the real estate listing, the representations in the

---

[15] Mr. Brown's testimony that his "kids" haphazardly would pay rent while living above the Garage, *see* R.R. at 99, does not change our conclusion. Such payment of rent by family members would not necessarily establish a lease and, more importantly, does not establish in any sense that the two teenage boys who initially inhabited the space above the Garage ever paid any rent.

21

Seller's Disclosure Statement, and the *fact* of Attorney Hanyon's legal representation to justify taking no steps to verify the Property's status in this regard.

As we stated in in *Skarvelis*:

While we have no record evidence to doubt the veracity of Skarvelis' claim that at the time of purchase he believed that the property's use as a two-family dwelling conformed with the [z]oning [o]rdinance, this is insufficient to establish good faith. Absent a local ordinance provision to the contrary, the law requires a prospective purchaser of real estate to make certain the property is in compliance with local zoning requirements, . . . and the purchaser may not rely on the statements of others, including dishonest real estate agents, to establish compliance. If this were not the law, the doors would certainly open wide for unscrupulous individuals to perpetrate a fraud on local municipalities.

In order to establish that he acted in good faith, a property owner is required to show that he made a reasonable attempt to ascertain the actual status of the property under the [z]oning [o]rdinance. . . . If Skarvelis had searched the [b]orough's records here, he would have found that an occupancy permit for the property as a two-family dwelling had never been obtained. This would have put him on notice that there was a problem with the property and would have [led] a reasonable person to inquire further regarding possible limitations on the use of the property. . . .

We also reject the contention of Skarvelis that he was justified in his belief because of the representations of the real estate agent who negotiated the sale of the property. While we certainly do not endorse such conduct by members of the real estate profession, even if such were true in this case, a property owner simply cannot acquire a right to a variance by estoppel through the actions or representations of prior owners, real estate agents, or other third parties who do not speak for the municipality. . . . One who purchases property based on the representations of the seller, rather than making an independent investigation of the true status of the property, proceeds at his or her own risk, and cannot

22

later complain that a variance should be granted if those representations prove to be false.

679 A.2d at 282-83.

Here, Landowners could not blindly rely on representations in a real estate listing or a seller's disclosure statement to satisfy their obligation to investigate the zoning compliance of the Property. Moreover, although a settlement company or attorney could perform such an investigation at a purchaser's request, there is no indication in the record either that any investigation of such matters was conducted at all or that Attorney Hanyon was "retained" by Landowners to do such work. Instead, the documentary evidence indicates that Attorney Hanyon performed only document preparation and review and did not undertake to investigate the Property's permitting and conformity to the Ordinance. Mr. Rylka's testimony was clear that Landowners performed no search or investigation whatsoever and relied entirely on what they observed on the Property and in the documents involved in the sale. Without more, and without any evidence that they were justified in relying on Attorney Hanyon to do their investigation for them, this factor is not satisfied. The ZHB's findings in this regard therefore are supported by substantial evidence in the record.

Because Landowners failed to establish before the ZHB the first two elements of their variance by estoppel claim, the ZHB did not err or abuse its discretion in rejecting it.[16]

### 3.    Equitable Estoppel

Lastly, under the theory of equitable estoppel, a municipality may be estopped from prohibiting an otherwise nonconforming use where (1) the municipality intentionally or negligently misrepresented to a landowner that the use was permitted;

---

[16] Because Landowners did not satisfy the first two elements of the variance by estoppel claim, we need not address the last two elements, namely, substantial expenditures and unnecessary hardship.

(2) the municipality knew or had reason to know that the landowner justifiably would rely on the misrepresentation; and (3) the landowner was, in fact, induced to rely to his detriment on the misrepresentation. *Cicchiello v. Bloomsburg Zoning Hearing Board*, 617 A.2d 835, 837 (Pa. Cmwlth. 1993).

Here, there is no evidence in the record that the Township made any representations intentionally or negligently to either the Browns or Landowners indicating that a multi-family use was permitted on the Property. Although Landowners have pointed to certain physical aspects of the Property and conversations with Township representatives *about other permitted uses or structures* to argue that the Township both knew or should have known of the multi-family use and acquiesced to it, those facts do not establish that the Township affirmatively represented to Landowners or their predecessors that such use was authorized. Without such a representation, Landowners' equitable estoppel claim properly was rejected by the ZHB.

## IV. CONCLUSION

Having concluded that the ZHB did not err or abuse its discretion in concluding that Landowners failed to establish their entitlement to continue the multi-family use on the Property under any equitable theory, we affirm the trial court's order affirming the ZHB's decision.

_____
PATRICIA A. McCULLOUGH, Judge

24

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Eric Rylka and Christina Rylka, : 
               Appellants : 
                : 
          v. :    No. 1243 C.D. 2024
                : 
Zoning Hearing Board of Hamilton : 
Township and Hamilton Township : 

## ***ORDER***

AND NOW, this 27th day of January, 2026, the order entered by the Court of Common Pleas of Monroe County on July 23, 2024, is hereby AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge